**Ariel SHARON, Plaintiff,**

v.

**TIME, INC., Defendant.**

**No. 83 Civ. 4660 (ADS).**

United States District Court, S.D. New York.

Nov. 12, 1984.

---

Shea & Gould, New York City, for plaintiff; Milton S. Gould, Bernard D. Fischman, Arnold Forster, Richard M. Goldstein, Adam B. Gilbert, Andrea B. Feller, New York City, of counsel.

Cravath, Swaine & Moore, and Time, Inc., New York City, for defendant; Thomas D. Barr, Robert S. Rifkind, Paul C. Saunders, Stuart W. Gold, Ronald K. Chen, Kathleen L. Beggs, Israel Leshem, Stephen S. Madsen, Ellen S. Oran, Anne E. Verdon; William M. Guttman, Harry M. Johnston, III, Robert P. Marshall, Jr., New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

Plaintiff Ariel Sharon was the Minister of Defense of the State of Israel from August 1981 until February 11, 1983. During his tenure, Israel embarked upon "Operation Peace for Galilee," an invasion of Lebanon intended to eliminate strongholds from which terrorists of the Palestine Liberation Organization ("PLO") had been launching attacks on Israel. During Isra-

el's occupation of West Beirut, and by prior arrangement with the Israel Defense Forces ("IDF"), members of the Christian Phalangist militia entered two Palestinian refugee camps, Sabra and Shatilla. From September 16 to September 18, 1982, the Phalangists killed hundreds of Palestinian civilians, many of them women and children. As a result of this tragic event, Israel established a Commission of Inquiry Into the Events at the Refugee Camps in Beirut ("the Kahan Commission"). The Commission was charged with determining who was responsible for the killings. It issued its Final Report ("the Report") on February 7, 1983.

Defendant Time, Inc., publishes Time Magazine. Time's February 21, 1983, issue, which appeared on newsstands during the week of February 14, contained an article entitled "The Verdict Is Guilty: An Israeli commission apportions the blame for the Beirut massacre" ("the Article") (Def. Exh. 12).[1] The article contained a discussion of the Kahan Commission's findings and recommendations. Time described the Report as a "stinging indictment" of Minister Sharon and extensively quoted the Report's findings that failure to consider the possibility of the murder of innocent Palestinians "constitute[s] the nonfulfillment of a duty with which the Defense Minister was charged," and that his behavior renders him indirectly responsible for the massacre. Report at 71;[2] Article at 29. Time also reported the Commission's recommendation that Sharon "should draw the appropriate personal conclusions" and resign his office. Report at 105; Article at 29.

Sharon sued Time for libel. He does not base his suit on the overall thrust of Time's critical article, most of which is absolutely protected either as opinion or as the fair

1. Documents are cited, whenever possible, either to the Appendix to Memorandum in Support of Time Incorporated's Motion to Dismiss and for Summary Judgment ("Def.Exh. ___") or to the Exhibit Book on Behalf of Plaintiff Ariel Sharon in Opposition to Defendant's Motion to Dismiss and for Summary Judgment ("Pl.Exh. ___"). Plaintiff has also submitted

unbound exhibits, identified numerically. Citations to deposition testimony are identified by the name of the witness (e.g., "Halevy Tr. at ___").

2. All citations to the Final Report are to the pagination of the official authorized translation.

report of a judicial proceeding. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974); N.Y.Civ. Rights L. § 74 (McKinney 1976). Instead, Sharon bases his case on one paragraph of the article, which states:

> One section of the report, known as Appendix B, was not published at all, mainly for security reasons. That section contains the names of several intelligence agents referred to elsewhere in the report. Time has learned that it also contains further details about Sharon's visit to the Gemayel family on the day after Bashir Gemayel's assassination. Sharon reportedly told the Gemayels that the Israeli army would be moving into West Beirut and that he expected the Christian forces to go into the Palestinian refugee camps. Sharon also reportedly discussed with the Gemayels the need for the Phalangists to take revenge for the assassination of Bashir, but the details of the conversation are not known.

Article at 29. Sharon claims that this paragraph is false, both because he never discussed the need for revenge with the Gemayels and because the Commission Report contains no details of such a discussion. He claims that this paragraph is defamatory both because it suggests that he instigated, encouraged, or condoned the massacres at Sabra and Shatilla, and because it suggests that the Commission had secret evidence or found secretly that he had lied when he testified that he had not known in advance that a massacre would occur.

Time moved to dismiss plaintiff's complaint on the grounds that the paragraph was not capable of a defamatory meaning, that plaintiff was libel proof, and that plaintiff had failed to allege special damages. That motion was denied in an opinion concluding that the statement was capable of a variety of defamatory meanings, that the Commission's strong criticism of Sharon had not rendered him libel proof, and that, because the statement was libelous per se, plaintiff was not required to allege special damages under New York law. *Sharon v. Time, Inc.*, 575 F.Supp.

1162, 1165–73 (S.D.N.Y.1983) (*Sharon I*). Following that opinion, both sides engaged in extensive discovery, during the course of which a decision was issued setting certain limits on the scope of discovery and refusing to bifurcate the trial. *Sharon v. Time, Inc.*, 103 F.R.D. 86 (S.D.N.Y.1984) (*Sharon II*).

Defendant has now moved for summary judgment pursuant to Fed.R.Civ.P. 56 or, in the alternative, for dismissal pursuant to Fed.R.Civ.P. 12(b)(6). Defendant assumes for the purposes of its motion that "the paragraph challenged by plaintiff was totally false." Memorandum in Support of Time Incorporated's Motion To Dismiss and for Summary Judgment at 5 ("Defendant's Memorandum"). It raises five other arguments: (1) the "act of state" doctrine precludes this court from exercising jurisdiction over this case; (2) the First Amendment provides absolute immunity for criticism of the official acts of high governmental officials such as Sharon; (3) Time's inability to obtain necessary information from the State of Israel and from plaintiff has rendered it incapable of defending itself consistently with the requirement of due process; (4) as a matter of law, a jury could not conclude that plaintiff has proved with convincing clarity that defendant acted with actual malice; and (5) because plaintiff as a matter of law has no compensable damages, he cannot maintain this suit merely to attempt to recover punitive damages. For the reasons stated below, defendant's motion is denied.

## I. The Act of State Doctrine and Justiciability

Time argues that the federal courts may not adjudicate this case because the litigation will require the jury to render judgment as to the validity of numerous acts of the States of Israel and Lebanon. Time claims that proof concerning these "acts of state" is unavoidable, and that litigation concerning them is inappropriate due to the absence of judicial standards and the potentially adverse impact of the trial and the jury's findings on the foreign relations of

the United States. Time's proposed acts of state, however, are not the types of acts that provide a proper basis for applying the act of state doctrine. Time's arguments nevertheless raise a substantial issue of nonjusticiability; this litigation involves questions that are difficult to litigate efficiently, and disclosures and findings may result that could embarrass the United States or other nations. Assuming that the federal courts can refuse to decide cases as nonjusticiable, however, a balancing of the relevant considerations fails to justify dismissal here.

*A. The Act of State Doctrine*

 The act of state doctrine provides that a United States court "will refrain from examining the validity of an act of a foreign state by which that state has exercised its jurisdiction to give effect to its public interests." *Restatement (Second) of Foreign Relations Law* § 41 (1962). The doctrine is limited to laws, decrees, decisions, seizures, and other officially authorized "public acts." The acts to which the doctrine has been applied have been official attempts to implement public policy, and a fairly stringent degree of formality may be required in proving such an act, at least where it is alleged to have occurred with respect to a subject not normally controlled by public acts. Thus, in *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), the Supreme Court rejected the view that an act of state was established by a representation of counsel that an ordinary commercial obligation had been officially repudiated. The Court held that Cuba's mere refusal to pay the debt did not constitute a repudiation sufficient to trigger the act of state doctrine:

> No statute, decree, order, or resolution of the Cuban Government itself was offered in evidence indicating that Cuba had repudiated its obligations in general or any class thereof or that it had as a sovereign matter determined to confiscate the amounts due three foreign importers.

*Id.* at 695, 96 S.Ct. at 1861; *see The Supreme Court—1975 Term,* 90 Harv.L.Rev. 265, 271–72 (1976).

In this case, Time almost indiscriminately states that "a trial of this action will require the jury to render judgment as to numerous acts of the States of Israel and Lebanon," and lists historical events including "the meetings and discussions among Bashir Gemayel and representatives of Israel," "internal debates within the Israeli Cabinet," "the decision to send the Phalangists into the refugee camps," and the proceedings and findings of the Israeli Commission which investigated the massacres. Defendant's Memorandum at 61–62. In substance, Time contends: "Sharon's Acts and the Kahan Commission Proceedings Were Acts of the State of Israel." *Id.* at 72. Furthermore, Time seems to argue that this very suit is an act of state, since it was brought by a former and present minister in Israel's government, allegedly with that government's approval.

 Neither Sharon's alleged acts, nor the findings of the Commission, nor Israel's alleged participation in this suit constitutes an act of state within the meaning of the doctrine. With respect to the alleged actions of General Sharon by which Time claims he approved or condoned the massacre, Time does not claim that General Sharon was authorized by the State of Israel to perform such acts; to the contrary, Time has alleged throughout the litigation that Sharon went beyond his authority in the campaign in Lebanon and intentionally misled Prime Minister Begin and the Cabinet into expanding the war. Although actions by military officers are often considered acts of state, *see Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), they are acts of state only because they are officially authorized. The actions of an official acting outside the scope of his authority as an agent of the state are simply not acts of state. In no sense are such acts designed to give effect to a State's public interests. *See Restatement (Second) of Foreign Relations Law* § 41 (1962). As the Second Circuit stated in

*Filartiga v. Pena-Irata,* 630 F.2d 876, 889 (2d Cir.1980): "[W]e doubt whether action by a state official in violation of the Constitution and laws of the Republic of Paraguay, and wholly unratified by that nation's government, could properly be characterized as an act of state."

Time also claims that the Kahan Commission's findings that General Sharon did not approve or condone the massacre are acts of state. The findings or judgments of a court may constitute acts of state, where the court has been used by a state to exercise "its jurisdiction to give effect to its public interests." *Restatement (Second) of Foreign Relations Law* § 41, comment d, at 127. Here, the Commission was called upon by the Israeli government to perform an extraordinary function, including the making of recommendations with respect to the massacre. In utilizing the Commission process, however, the Government did not delegate its legislative authority; the Commission was empowered only to issue its own findings and recommendations, not those of the State of Israel, and these findings and recommendations were not binding upon the Government. Defendants concede that "[a]s a matter of law the report of a commission of inquiry does not bind the Government unless adopted by it." Defendant's Supplemental Memorandum on the Act of State Doctrine at 4. When the Government adopted the Commission's recommendations, moreover, it did not thereby adopt the Commission's findings. Those findings remained findings only of the Commission. To the extent the recommendations became acts of state, it was only because the Government made them so through its own declarations. *See* Press Release by the Secretariat of the Government ("The government resolved today to accept the recommendations contained in the Report of the Commission of Inquiry into the Events at the Refugee Camps in Beirut.") (attached to letter from Stuart W. Gold, Esq., Nov. 6, 1984).

Time also seems to contend that Israel's alleged participation in this lawsuit constitutes an act of state. Time claims that the Israeli Government "has been supporting its champion—whether appointed or voluntary—by paying certain of his litigation expenses, and by actively blocking Time from access to important evidence regarding the events at issue." Defendant's Memorandum at 64; *see* Ma'ariv, Sept. 9, 1984 (Def.Exh. 13). The record fails to support Time's claim that Israel condones, let alone supports, General Sharon's suit. In any event, Time's suggestion of conspiracy between General Sharon and the Israeli Government raises, if anything, an issue of due process, and as such is discussed below. Here, it suffices to note that even if Israel were an active litigant, as it sometimes is in this court, its litigation activities would not become acts of state in the sense intended by the doctrine.

The act of state doctrine is also inapplicable here because, even assuming that Sharon's alleged acts or the Commission's findings are acts of state, the issues in this case do not require the jury to pass on the validity of these acts. The proscription of the doctrine is limited to judicial determinations of the validity of acts of a foreign sovereign and to judicial redress of grievances predicated upon a finding of invalidity. Thus, in the classic American statements of the doctrine, *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897), and *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964), the Supreme Court applied the act of state doctrine for the limited purpose of avoiding determinations of the validity of official acts of foreign states and preventing invalidation of these acts. In both cases, the validity of an act or order of expropriation was directly in issue, and a finding for the defendant would have required invalidation of the Mexican or Cuban government's official act. *See Associated Container Transportation (Australia) Ltd. v. United States,* 705 F.2d 53, 61 (2d Cir.1983); *Rasoulzadeh v. Associated Press,* 574 F.Supp. 854, 860 (S.D.N.Y.1983).

By contrast, the litigation here involves no challenge to the validity of any act of state. With respect to Sharon's alleged acts, no one is suggesting that these acts—by which Time claims Sharon condoned the massacre of unarmed noncombatant civilians—have validity in the sense that they cannot be attacked. All agree—Israel, the United States, and the world community—that such actions, if they occurred, would be illegal and abhorrent. The issue in this litigation is not whether such acts are valid, but whether they occurred.

In connection with the findings of the Kahan Commission, once again the issue is not the validity of the findings, but only whether certain findings were made. To resolve the issues in this litigation regarding the secret appendix, the jury need only make a factual determination as to whether Appendix B contains the alleged details of the condolence call reported in the Time article. The jury is not called upon to determine, and need not pass upon, the validity or even the propriety of the Commission's findings and report.

Moreover, a verdict or findings that support Time's version would have no more effect on the alleged acts of state than to grant Time a victory in this suit. Thus, a finding by the jury that General Sharon condoned the massacre would have no direct effect on any official declaration, decree, law, or act of the State of Israel. Similarly, a finding that Appendix B does contain the alleged details would have no direct effect on the Report itself, on the Commission, or on the Israeli Government. Such findings would simply establish that Time did not libel Sharon by its statements regarding Sharon's conduct and the contents of Appendix B. By contrast, had the validity of the expropriation decree in *Sabbatino* been successfully attacked, plaintiff could not have sued in American courts to collect the defendant's debt, 376 U.S. at 398, 84 S.Ct. at 923; and in *Underhill*, had the validity of the defendant's conduct been successfully attacked, the plaintiff would have been entitled to an award of damages against a Venezuelan military commander, 168 U.S. at 250, 18 S.Ct. at 83.

■ The remedy that Time seeks in this litigation—dismissal—is also inconsistent with the manner in which the act of state doctrine is traditionally implemented. The act-of-state doctrine is, in its origins and essence, a federal rule mandating a choice of law by which to judge the validity of the official actions of sovereign states. In *Ricaud v. American Metal Co. Ltd.*, 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918), the Court applied the act of state doctrine in the context of a claim for the return of property seized by General Carranza in the Mexican Revolution. The language in *Ricaud* illuminates the nature of the act of state doctrine as a rule for the choice of governing law:

> [The rule] does not deprive the courts of jurisdiction once acquired over a case. It requires only that, when it is made to appear that the foreign government has acted in a given way on the subject-matter of the litigation, the details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision.

*Id.* at 309, 38 S.Ct. at 313. The doctrine's application did not result in the loss of jurisdiction, but in a rule of law by which the decision was to be made. The Court held only that title to the property seized by military levy from an American citizen "must be determined by the result of the action taken by the military authorities of Mexico ...." *Id.* Similarly, in *Sabbatino*, the federal courts were not deprived of jurisdiction over the claim. Rather, they were required to decide Cuba's claim—and to enforce it if no other defense existed—on the assumption that the expropriation of American owned property in Cuba was lawful. *See* 376 U.S. at 439, 84 S.Ct. at 946.

■ Although the act of state doctrine is a rule governing choice of law and not justiciability, dismissal of a claim may be appropriate when an act of state is involved, if its assumed validity precludes the possibility of any relief for an opposing party. In *International Association of Machinists and Aerospace Workers v. Or-*

ganization of the Petroleum Exporting Countries, 649 F.2d 1354 (9th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982) ("OPEC"), for example, the court dismissed a complaint "where the controlling issue is the legality of a sovereign act [OPEC's conspiratorial price increase for oil] and where the only remedy sought is barred by act of state considerations...." Id. at 1361. Here, however, if the alleged acts of state were assumed to be valid, no remedy for the plaintiff, or defense by the defendant, would be precluded.

### B. Justiciability

Time recognizes that its act of state contentions fail to fit the traditional requirements. It argues alternatively, however, that the considerations which have led courts to invoke the doctrine—including a lack of governing standards, the ineffectiveness of judicial relief, and the potential for interference with the Executive branch, see Sabbatino, 376 U.S. at 427-37, 84 S.Ct. at 939-45—are present here. In particular, Time contends that the federal courts have no manageable standards by which to decide the issues in this case; that the difficulty of obtaining necessary evidence reflects the impropriety of having a court pass on such matters as the conduct of a war; that the litigation raises questions that both the United States and Israel regard as highly sensitive and delicate; and that the findings and conclusions reached in this case could embarrass our government and one of its closest allies. As Time puts it:

> [T]here is no way to avoid the issue of determining the extent of Ariel Sharon's, and hence the State of Israel's, involvement in the massacre at Sabra and Shatilla. It is hard to conceive of a verdict by an American court that would have a clearer capacity for mischief in the American foreign policy realm than a holding by a United States jury that Israel—the findings of its own Commission of Inquiry to the contrary—condoned, let alone encouraged, the Sabra and Shatilla massacres. This is precisely the kind of

issue the act of state doctrine holds American courts must avoid.

Defendant's Memorandum at 62–63. Furthermore, citing the decision denying its motion to dismiss, Sharon I, 575 F.Supp. at 1166–67 (S.D.N.Y.1983), Time points out that the alleged libel could be read to suggest that the Commission consciously suppressed adverse information about Sharon to protect Israel from a finding of direct responsibility. Defendants' Memorandum at 77. As Time explains:

> Plaintiff will undoubtedly attempt to prove that the Commission did nothing of the kind and that the implication that it did is false. To combat the alleged innuendo, Time will demonstrate that the Kahan Commission did, as the Court has put it, withhold additional material. See 575 F.Supp. at 1167. Obviously, this raises the need for the jury to reexamine what evidence the Kahan Commission had before it and what it did with that evidence. But such an examination is barred by the act of state doctrine.

Defendant's Memorandum at 78.

The act of state doctrine certainly shares most of the same concerns that the Supreme Court relies upon in determining justiciability, particularly when the issue of justiciability arises in the context of the "political question" doctrine. Over sixty years ago, the Supreme Court invoked simultaneously the notion of "political question," as well as the Underhill act of state doctrine. See Oetjen Central Leather Co., 246 U.S. 297, 302–03, 38 S.Ct. 309, 310–11, 62 L.Ed. 726 (1918). By contrasting the reasoning in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and in Sabbatino, moreover, the similarity between the doctrines with respect to the considerations weighed, and the weighing process itself, demonstrates their commonality. Both decisions call for a case-by-case balancing process, and focus on the propriety of a decision by the judicial as opposed to the "political" branches. See also Associated Container, 705 F.2d at 61 (application of act of state doctrine depends upon a balancing of relevant considerations and a

careful case-by-case analysis of the extent to which separation of powers concerns are implicated); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 316 n. 38 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982) (same); *Rasoulzadeh,* 574 F.Supp. at 856, 858–60 (same). The considerations to be weighed include the existence of "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710; the availability of judicially discoverable and manageable standards for decision; the ability of courts to secure the facts necessary for efficient adjudication; the capacity of courts to render a decision that will prove effective; and the possibility of embarrassment to or conflict with a coordinate political branch—particularly in the conduct of the Executive's foreign-affairs powers. *See id.; Sabbatino,* 376 U.S. at 427–37, 84 S.Ct. at 939–45. *See generally* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart and Wechsler's The Federal Courts and The Federal System* 233–41 (2d ed. 1973); G. Gunther, *Cases and Materials on Constitutional Law* 1619–27 (9th ed. 1975); L. Tribe, *American Constitutional Law* § 3–16, at 71 (1978); Bickel, *The Supreme Court, 1960 Term—Foreword: The Passive Virtues,* 75 Harv.L. Rev. 40, 75 (1961).

The underlying similarities between the act of state and justiciability doctrines have in fact led courts to resort to general abstention principles in dealing with act-of-state contentions. In *OPEC,* the Ninth Circuit treated the act of state doctrine as a political question doctrine for foreign affairs:

> The act of state doctrine is similar to the political question doctrine in domestic law. It requires that the courts defer to the legislative and executive branches when those branches are better equipped to resolve a politically sensitive question. Like the political question doctrine, its applicability is not subject to clear definition. The courts balance various factors to determine whether the doctrine should apply.

649 F.2d at 1358–59; *see also Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Abroad the Tanker Dauntless Colocotronis,* 577 F.2d 1196, 1201–05 (5th Cir.1978) (relying on political question doctrine to affirm trial-court dismissal on act of state grounds), *cert. denied,* 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979); *Hunt,* 550 F.2d at 77 (act of state doctrine expresses a "policy of judicial abstention"); *De Roburt v. Gannett Co., Inc.,* 548 F.Supp. 1370, 1375–76 (D. Hawaii 1982) ("the courts should seek to avoid passing on the validity of foreign acts"), *reversed on other grounds,* 733 F.2d 701, 703 (9th Cir.1984). This trend is perhaps nowhere more clearly stated and justified than in Lord Wilberforce's opinion in *Buttes Gas and Oil Co. v. Hammer,* 3 W.L.R. 787 (1981). Finding that traditional rules against judicial review of acts of state were insufficient to justify relying on the act of state doctrine, he turned to the question whether "there exists in English law a more general principle that the courts will not adjudicate upon the transactions of foreign sovereign states;" a principle that is not "a variety of 'act of state' but one for judicial restraint or absention." *Id.* at 804. He found such a principle, in part based on *Sabbatino,* which he concluded reflected "a 'flexible' use of the [act of state] doctrine on a case to case basis, ... [with] room for a principle, in suitable cases, of judicial restraint or abstention." *Id.* at 806.

Assuming for now the propriety of the extraordinary development in judicial abstention that these and similar cases represent, the balancing process described in *Baker v. Carr* and *Sabbatino* supports the exercise of jurisdiction in this case.

1. *Constitutional Commitment to Political Branch.*

Turning first to that aspect of the political question doctrine that has consistently been given greatest weight in decisions to abstain, the issues here are not

committed by constitutional authority to another branch. This litigation is for libel, it is based on state law, and Congress has authorized it to be filed and decided in this federal court. 28 U.S.C. § 1332(a)(2) (1982). The foreign-affairs aspects of the case, arising from Time's defenses, are not the types of issues expressly conferred upon or routinely decided by the executive or legislative branch. *Cf., e.g., Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952) (control over deportation of aliens entrusted to political branches); *Oetjen,* 246 U.S. at 302, 38 S.Ct. at 310 (recognition of foreign sovereign is "political question" conclusively assigned to legislative and executive branches); *Luther v. Borden,* 48 U.S. 1 (7 How.), 12 L.Ed. 581 (1849) (guarantee of republican form of government allocated to political branches). Neither the legislature nor the executive has any specific power over such matters as deciding what General Sharon in fact did or said in connection with the massacre, or what the Commission secretly found or discussed in its report. The executive's authority to pass on such issues lies only in its general control of foreign affairs. That a matter touches on foreign affairs is significant to justiciability. "Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Baker v. Carr,* 369 U.S. at 211–12, 82 S.Ct. at 706–07; *see Associated Container,* 705 F.2d at 61 ("the mere fact that a lawsuit involves activities abroad ... does not imply that American courts are without jurisdiction").

The narrow issues posed here have no history of management by the political branches. The legislature has had no role, and the executive has taken no position, on General Sharon's conduct in Lebanon, on the Commission's findings, or on this litiga-

tion. Both the United States and Israeli governments are treating this case as a private litigation. Thus, the Department of Justice has described this case as one involving "the interests of private parties" and as a "litigation in which the United States is neither implicated nor has an interest." Memorandum of Points and Authorities in Support of Motion to Quash Subpoena at 10, *Sharon v. Time, Inc.,* No. F.S. 84-0549 (D.D.C.1984). The Executive Branch has been actively and intensively engaged in the management of relations with Israel and Lebanon, and between those states. High officials of the Department of State, and of Israel's Ministry of Justice, have pointed out that the issues raised in this litigation are highly sensitive, involve secret dealings, and concern ongoing efforts to bring peace and stability to the Middle East. These statements, however, have all occurred in the context of wideranging demands by Time for information. Thus, the Department of Justice's statement that a "risk" existed of "the disruption of international relations" was made in the context of an argument that a deposition subpoena for former Ambassador Draper be quashed until Time tried to obtain the information it sought from other sources. *Sharon v. Time,* Misc. No. 84–241, Transcript at 24 (D.D.C. (Sept. 21, 1984)). Similarly, Assistant Secretary of State Richard W. Murphy noted: "The events which were related to the massacre at the Sabra and Shatila camps in September of 1982, occupied the center of U.S. Presidential and diplomatic attention and involved issues of the utmost sensitivity and importance to U.S. foreign relations interests ..."; but this statement also concerned the Government's motion to quash. Declaration of R.W. Murphy at 4–5 (Sept. 20, 1984). Kenneth W. Dam, acting as Secretary of State, and Deputy Assistant Secretary of State John R. Burke filed affidavits invoking the state secrets privilege with respect to information sought by Time, and explained the grounds for withholding certain material, including the need to protect confidential communications, se-

cret operations, and informants. Opposition to Motion to Compel, Misc. No. 84–0246, D.D.C. (Oct. 12, 1984). Here also the Department was taking no position on the propriety of this litigation, but only opposing some of the broad discovery sought by Time. *See* Opposition to Motion to Compel, Misc. No. 84–0246, D.D.C. (Oct. 12, 1984). Finally, M. Dennis Gouldman, head of the International Section of Israel's Ministry of Justice, stated in a letter to this court that "this case deals with highly sensitive topics relating to military actions, intelligence concerns and matters of Israel's foreign relations," but this reference responded to "requests for legal assistance" which Israel's Attorney General noted "were drawn up in extremely broad terms . . . ." Letter from M. Dennis Gouldman at 1–3 (Oct. 15, 1984). An expression by a government that disclosure of information in its control may adversely affect national interests differs materially in its importance to abstention from an expression of concern addressed to the possible effects of the litigation itself. In the first situation, the custodian is able to avoid the adverse effects by nondisclosure, whereas in the second, the damage can be avoided only by terminating the litigation or circumscribing its scope. This case falls squarely within the former category.

### 2. *Manageable Standards.*

Manageable standards exist by which to resolve the factual and legal issues that may be presented in this litigation. The central issues are factual—whether Appendix B contains the discussion alleged by Time and whether that discussion occurred. Issues of historical fact are sometimes difficult to resolve, and the absence of evidence may require that findings turn on presumptions or allocations of the burden of proof. But such issues are conventional fare for juries and judges, and here the presumptions and burdens imposed will overwhelmingly favor the defendant. Furthermore, no difficult question of Israeli or international law is posed by the litigation. In *Sabbatino*, the Court found that whether Cuba's expropriation was lawful under international law was an issue with respect to which substantial, strongly felt differences existed in the international community. It ruled that courts must weigh the "degree of codification or consensus concerning a particular area of international law" in considering whether to apply the act of state doctrine. 376 U.S. at 428, 84 S.Ct. at 940. Here, the only conceivable issue of Israeli or international law—the propriety of authorizing or condoning a tactically needless massacre of noncombatant, unarmed civilians—is not in dispute. *Cf. Filartiga*, 630 F.2d at 881–85 (no controversy over legality of torture). In general, the world community agrees that such actions are illegal and abhorrent, and this consensus has assumed a high degree of codification in local and international law. *See, e.g.,* Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, T.I.A.S. No. 3365, 75 U.N.T.S. 287, art. 27, 32–33 (protecting persons from all acts of violence, including murder); Proclamation of Tehran, May 13, 1968, U.N. Doc. A/CONF. 32/41, Sales No. 68, XIV 2, art. 10 (international community must cooperate in eradicating massive denials of human rights arising out of aggression or any armed conflict); Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277, arts. I, II(a) (acts committed with intent to destroy, in whole or in part, a national, ethical, racial or religious group are crimes under international law). Therefore, no lack of manageable standards exists by which to resolve the issues presented.

### 3. *Ability To Secure Necessary Facts.*

The representations of both governments concerning the sensitivity of the issues are relevant insofar as they indicate that information may be withheld. Limited access to information may stem from the nature of a particular case, thereby reflecting its possible unsuitability for judicial resolution. Even if the lack of evidence fails to establish a violation of due process, the fact that sensitive or secret material is central to the

case and is unavailable must also be weighed in considering abstention.

Still, such withholding is routine in all cases touching on the many categories of information deemed confidential by governments, and its significance will depend entirely on the importance to the litigation of what is withheld. The present record fails to establish Time's argument that it has been denied the information it needs to defend itself. The substantial evidence available on the issues is summarized below, and it includes the Commission Report. Time has also succeeded in obtaining useful information from the Department of State and from the State of Israel. The Department of State has provided Time with ten documents in their entirety; forty-seven documents in part; and it has withheld forty-three documents. In addition, Time has examined Ambassador Morris Draper, who was the principal American diplomatic officer in Beirut during the relevant period, for over two full days. Whether Time will be permitted to call Ambassador Draper, or to use his deposition testimony at trial, remains to be decided; the Department opposes his appearance or testimony. Nevertheless, the information provided Time by the Department is substantial, much of it was declassified so it could be used, and the process of attempting to supply as much as possible is continuing. The Department has thus indicated no objection to the suit going forward, and has even cooperated with Time's needs, subject to protecting the public interests of the United States—a concern present in all litigation affecting foreign affairs.

The Government of Israel is not as far advanced as the Department in formulating its response to the parties' requests. Mr. Gouldman recently informed this court, however, that the Attorney General of Israel would support allowing a limited examination of Appendix B and of minutes taken at Sharon's meetings in Karentina and Bikfaya. Letter from M. Dennis Gouldman at 1–2 (Oct. 30, 1984). Furthermore, Time will be allowed to depose five Israeli officials, although it will not be permitted to examine every individual whose testimony it seeks. A detailed request for various forms of disclosure from the court to Israel's Ministry of Justice is presently pending. A final appraisal of the parties' ability to obtain information must await the results of this pending effort, but a positive response seems at least a good possibility.

### 4. *Capacity To Render an Effective Decision.*

The judiciary is the most effective avenue for resolving Minister Sharon's claims against Time. This court is available to decide all recognized claims, and no obstacle exists, should General Sharon prevail in this litigation, to full judicial redress of his grievances through an award of damages.

That the United States and Israel are close allies with good relations is reason to adjudicate this suit rather than to abstain. American and Israeli citizens have free access to each others' courts. Both nations are members of the 1970 Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, 12 U.N. T.S. 140. Furthermore, while some Convention members require treaty partners to use the sometimes time-consuming Convention process, Israel does not. It has accepted Letters of Request addressed directly to the competent authority, and has transmitted them on an expedited basis through diplomatic channels. *See* 28 U.S.C. § 1781(a)(2) (1982); Fed.R.Civ.P. 28(b); 22 CFR § 92.66(b) (1984). The nations, in short, contemplate cooperation with each other's citizens who sue in their courts. Were the nations antagonistic, the chances of obtaining relief for any wrong done might be greater through diplomatic rather than judicial means, as Justice Harlan suggested in *Sabbatino.* 376 U.S. at 431–32, 84 S.Ct. at 941–42. Here, the courts are available to decide Sharon's claims, and the nations involved have in general left their citizens privately to pursue their rights. Israel would seem unlikely to seek relief for Minister Sharon through diplomatic means, and the United States would doubtless avoid placing any form of pressure on

Time to bring about a nonjudicial resolution.

5. *Possibility of Embarrassment or Conflict with the Political Branches.*

While a consideration of the foreign affairs implications of this litigation and the sensitivity of the issues involved is necessary, executive and legislative declarations provide the most reliable, and only authoritative, source of what measures best serve the interests of the United States. Where no representation has been made as to what those interests require, a court's effort to divine what is best for the nation will be speculative. Who is to say, for example, that it would best serve good relations between the United States and its allies to preclude defamation suits by political and military officers charged by the American press with gross violations of human rights? If human rights are to be accorded a favored status in federal jurisprudence, would it serve our foreign affairs interests to review the claims of alleged victims, but to refuse review for the claims of persons accused of such crimes who seek to demonstrate their innocence? If the Department of State unambiguously declared its position in a given case as to what would best serve the interests of the United States, that opinion would carry great weight. *See First National City Bank v. Banco National de Cuba,* 406 U.S. 759, 768, 92 S.Ct. 1808, 1813, 32 L.Ed.2d 466 (1972) (plurality opinion); *Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart Maatschappij,* 210 F.2d 375, 375–76 (2d Cir.1954); *Restatement (Revised) of Foreign Relations Law* § 428 at 9–10 (Tent.Draft No. 4, 1983) (where State Department issues letter requesting that courts not review validity of particular act, that letter will be highly persuasive if not binding; and where it issues letter stating that it has no objection to adjudication of act's validity, the court will take Executive's view into account, but is not bound by it in determining whether to apply act of state doctrine). Absent any such expression, however, a federal court should not readily assume that declining to decide a sensitive matter will best serve the nation's interests.

A consideration of such questions as the massacre of unarmed civilians no doubt touches "on national nerves," *Sabbatino,* 376 U.S. at 428, 84 S.Ct. at 940, and raises the possibility of embarrassment to the United States and Israel. This case, of course, does not entail judicial scrutiny of the legitimacy of such acts. But even if it did, a court should not refuse to apply established principles of human rights because of a doctrine designed to keep courts out of the business of enforcing property rights in litigation affecting property within a foreign sovereign state. To the contrary, *Sabbatino* suggests—and the most current authority proposes—that the act of state doctrine need not be applied to bar review of the violation of well recognized human rights. Thus, Justice Harlan stated:

> There are, of course, areas of international law in which consensus as to standards is greater and which do not represent a battleground for conflicting ideologies. This decision in no way intimates that the courts of this country are broadly foreclosed from considering questions of international law.

*Id.* at 430 n. 34, 84 S.Ct. at 941 n. 34. And the *Restatement (Revised) of Foreign Relations Law* § 428, comment 4, at 8 (Tent. Draft No. 4, 1983), contains the following relevant discussion:

> A claim arising out of an alleged violation of human rights—for instance a claim by the victim of torture or genocide—would (if otherwise sustainable) probably not be defeated by the act of state defense since the accepted international law of human rights contemplates external scrutiny of such acts.

Judicial abstention on political question grounds has similarly been found inappropriate when individual rights in domestic affairs are at stake, even where the litigation touches upon sensitive foreign affairs concerns, or deals with a subject allocated in the main by the Constitution to another branch. *See, e.g., Powell v. McCormack,*

395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Orlando v. Laird,* 443 F.2d 1039 (2d Cir.), *cert. denied,* 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971). That Time may attempt to establish that General Sharon—and through him the State of Israel—was responsible for fundamental violations of human rights raises the possibility of embarrassment for General Sharon and the State of Israel; but absent clear guidance to the contrary · from a political branch, nothing in our jurisprudence justifies a refusal to entertain General Sharon's claim that Time has already leveled such charges, falsely and with actual malice.

### C. Conclusion

The legitimacy of an expanded version of the act of state doctrine is far from clear. The substantial and rapid accumulation of authority in favor of a broadened use of the doctrine as a vehicle for judicial abstention has all taken place in the lower federal courts, in cases involving acts of state in the accepted sense. *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92, 110 (C.D.Cal.1971) (antitrust claim necessarily required consideration of validity under international law of territorial-waters decree), *aff'd,* 461 F.2d 1261 (9th Cir.) (per curiam), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972); *De Roburt v. Gannett Co.,* 548 F.Supp. 1370 (D.Hawaii 1982) (defamation claim required determination of legality of loan allegedly arranged by plaintiff head of state), *reversed on other grounds,* 733 F.2d 701 (9th Cir.1984); *cf. Hunt v. Mobil Oil Corp.,* 410 F.Supp. 10, 24 (S.D.N.Y.1975) (consideration of antitrust claim "would require inquiry into acts and conduct of Libyan officials, Libyan affairs and Libyan policies ... and the underlying reasons for the Libyan government's actions"), *aff'd,* 550 F.2d 68 (2d Cir.) (Libya's motivation for act of expropriation necessarily at issue), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977). Those Supreme Court cases that rely on a "political question" doctrine, moreover, generally use that concept in its narrowest sense—to signify that a particular issue, such as recognition of sovereignty, has been allocated to the political branches. Indeed, little support in Supreme Court holdings exists for a broader conception of "political questions," *see* Henkin, *Is there a Political Question Doctrine?,* 85 Yale L.J. 597 (1976), and the legitimacy of any broader conception of the doctrine has been forcefully challenged by eminent authority, *see* Wechsler, *Toward Neutral Principles of Constitutional Law,* 73 Harv.L.Rev. 1, 7–9 (1959).

Nor has the act of state doctrine received an enthusiastic response from the political branches, which are charged with regulating the jurisdiction of the federal courts. After *Sabbatino,* Congress limited the doctrine to prevent its application to claims for specific property located in the United States. Foreign Assistance Act of 1961, § 620(e)(2), 22 U.S.C. § 2370(e)(2) (1982). Similarly, in the Foreign Sovereign Immunities Act of 1976, § 4(a)(3), 28 U.S.C. 1605(a)(3) (1982), Congress deprived foreign states of immunity from jurisdiction in the federal courts in regard to claims based on their alleged taking of property located in the United States in violation of international law. *See generally* Note, *Limiting the Act of State Doctrine: A Legislative Initiative,* 23 Va.J.Int'l L. 103 (1982) (collecting authorities). Our national policy reflects, if anything, a reexamination of *Sabbatino,* rather than a political consensus for its transformation into a jurisdictional bar through its indiscriminate amalgamation with the analogous but similarly questionable device of judicial abstention. Absent some guidance to the contrary from the political branches, the present circumstances do not justify a refusal to perform the duty to adjudicate.

### II. Time's Claim of Absolute Immunity

■ Time argues that the press should enjoy absolute immunity from suit for statements about the official conduct of high government officers; and it claims that this blanket immunity applies to this case, both because Minister Sharon was, and is, among Israel's most powerful officials, and because the alleged defamation concerned his official conduct in prosecut-

ing a war. According to Time, the kind of statement with which this case is concerned should be given special protection for three reasons: first, because eliminating the danger of legal liability would encourage full and free discussion of critically important issues, such as responsibility for the brutal slaughter of innocent civilians; second, because giving the press absolute immunity for statements about public officials' performance of their jobs is consistent with the absolute immunity such officials enjoy for statements made in the course of their public duties; and third, because public officials such as Minister Sharon have sufficient access to the press to rebut charges made against them. Furthermore, Time contends that the prosecution of civil defamation actions such as this one is the equivalent of a "constitutionally impermissible prosecution for seditious libel." Defendant's Memorandum at 114.

The short answer to these arguments is that the Supreme Court has already weighed all the considerations Time advances and has chosen alternative means for protecting the strong interest in encouraging publication of views relating to official conduct. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court considered arguments for an absolute immunity for statements about public officials and rejected them. Instead, it fashioned the actual malice standard to give the press an especially high degree of protection in suits by public officials. The Court has also made clear that public officials must establish the falsity of the statements they claim are defamatory, thereby reversing the common-law burden of proof by which defendants were required to prove truth as a defense. *See Herbert v. Lando*, 441 U.S. 153, 159, 170, 175–76, 99 S.Ct. 1635, 1640, 1645, 1648–49 (1979); Franklin & Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity*, 25 W. & M.L.Rev. 825, 851–65 (1984). Furthermore, both federal and state law create privileges for statements of opinion, for neutral reportage, and for fair report of official proceedings. *See Cianci v. New Times Publish-*

*ing Co.,* 639 F.2d 54 (2d Cir.1980); *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). The effect of these overlapping substantive rules is to prohibit the imposition of liability on any defendant who has acted in good faith. Moreover, the Supreme Court's recent confirmation of the requirement of independent appellate review of jury findings also serves the substantive goals of the First Amendment. *See Bose Corp. v. Consumers Union,* —— U.S. ——, 104 S.Ct. 1949, 1960–65, 80 L.Ed.2d 502 (1984).

In contrast to the protective positions the courts have established with regard to the substantive law of libel, they have refused to approve special procedural rules for summary judgment, *see Calder v. Jones,* —— U.S. ——, 104 S.Ct. 1482, 1488, 79 L.Ed.2d 804 (1984); *Yiamouyiannis v. Consumers Union,* 619 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980), and they have refused the invitation to create a blanket immunity that depends solely on a plaintiff's status. "[C]omplete immunity ... has regularly [been] found ... an untenable construction of the First Amendment." *Herbert v. Lando,* 441 U.S. at 176, 99 S.Ct. at 1648. An absolute immunity would, for example, justify a knowingly false statement that Time had learned that Appendix B contained details of a secret visit by Minister Sharon to Sabra, where he had personally killed unarmed civilians. Nothing in the first amendment requires that the press have absolute freedom to pass such rumors off as fact, regardless how certain a reporter is of their falsity or how damaging they are to an official's reputation. The Supreme Court has rested its denial of absolute immunity on the fundamental premise that the constitutional value of free speech does not in all circumstances outweigh the states' interests in protecting the reputations of their citizens. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 341, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974), the Court stated that:

The need to avoid self-censorship by the news media is, however, not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation. See *New York Times Co. v. Sullivan, supra,* [376 U.S.] at 293 [84 S.Ct. at 733] (Black, J., concurring); *Garrison v. Louisiana,* 379 U.S. [64], at 80 [85 S.Ct. 209 at 218, 13 L.Ed.2d 125] (Douglas, J., concurring); *Curtis Publishing Co. v. Butts,* 388 U.S. [130], at 170 [87 S.Ct. 1975 at 1999, 18 L.Ed.2d 1094] (opinion of Black, J.). Such a rule would, indeed, obviate the fear that the prospect of civil liability for injurious falsehood might dissuade a timorous press from the effective exercise of First Amendment freedoms. Yet absolute protection for the communications media requires a total sacrifice of the competing value served by the law of defamation.

The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose . . . .

■ Time's claim that this action is the equivalent of a suit for seditious libel is similarly untenable. A vast difference exists between a government's effort to punish speech critical of official policy or acts, where even truth was no defense, and an official's effort to clear his name of an allegation that he acted contrary to official policy and human decency, in a situation in which he must prove both falsity and actual malice. *See generally* Rosenberg, *The New Law of Political Libel: A Historical Perspective,* 28 Rutgers L.Rev. 1141 (1975). The statement which plaintiff claims is offensive names him personally, without attributing his alleged discussion about revenge to his government. *Cf. New York Times Co. v. Sullivan,* 376 U.S. at 292, 84 S.Ct. at 732.

Finally, however much value Time's arguments may have in the abstract, this is not a case in which those arguments would justify immunity. Had Time stated that, in its view, the Commission should have found Minister Sharon "directly" responsible for the massacre, or even that he was unworthy of belief when he told the Commission that the possibility of such slaughter was "beyond his wildest dreams," absolute immunity might arguably serve the goals of robust and open debate underlying the first amendment. Whether or not such statements are, strictly speaking, "opinion," they cannot by their nature be disproved, and could be seen as a form of criticism of the official conduct of high government officers worthy of absolute protection.

The considerations marshalled by Time in its present defense might in those hypothetical cases justify a rule of absolute immunity. But the same values require no such rule when the press makes allegations of specific facts, the accuracy of which it vouches for with such descriptions as "Time has learned." In such a situation, the press enters public debate as an active investigator, seeking to influence the course of events with its own findings and reports, and not merely as an observer and commentator. The impropriety of immunity becomes clearer still when the press, rather than relying on publicly disclosed evidence or on its own reputation for credibility, attributes the findings it "has learned" to the secret portions of the report of an official, investigative body that has concluded its function and gone out of existence. The full protection of opinion and fair comment should encourage the press to express its opinions or comments as such, rather than to magnify the weight of its views by connecting them to the findings of fact of a body that has special authority over the issues involved. The protection of opinion and fair comment should not be expanded to encourage the press, with actual malice, to pass off its opinions or findings in a form that unfairly enhances the weight these opinions would otherwise receive in public debate.

High public officials certainly should be prepared to bear criticism and condemna-

tion in public debate, especially for official conduct, and to use the press to defend themselves. But sometimes the courts provide the only potentially effective forum of defense. In this case, the Commission had finished its work and in any event would probably not have entertained an application from Minister Sharon for a public clarification of the contents of an appendix it had decided to keep secret. Thus, Sharon had to look to Time itself to correct the defamatory implications of its story. Time's press release indicated that the paragraph was capable of the defamatory meaning which Time has consistently stated it did not intend to convey. Nevertheless, Time has refused to issue any correction or to print plaintiff's denial. Only through the litigation process has plaintiff been able to uncover and publish the evidence from which Time claimed to have learned the contents of the Commission's secret appendix. And only through this avenue has he been able to bring to light the process by which the allegedly offending statement came to be written, including evidence of the possible motivations and truthfulness of its author. That this process has proved enormously expensive, and painfully contentious, is as much the product of Time's all-out litigation strategy as of any plan by plaintiff to intimidate the press. Despite the fact that every single Time witness claims to have had no evidence that plaintiff knew in advance that the massacre would occur, Time has chosen to pour enormous resources into proving precisely that. Time may be entitled to enhance through such tactics the risks plaintiff faces in suing for defamation. But it would be pure fantasy to treat Time in this case like some struggling champion of free expression, defending at great risk to itself the right to publish its view of the truth.

### III. Due Process and Preclusion

Time raises two related arguments concerning its inability to obtain information which it believes to be central to its defense. First, it argues that Minister Sharon's refusal at his deposition to testify on certain subjects, particularly on what is contained in Appendix B and in the minutes taken at Bikfaya, requires that he be precluded from testifying on these subjects at trial. Second, Time argues that plaintiff and the Israeli government, acting either together or in concert, have obstructed Time's efforts to obtain discovery, particularly of evidence critical to its defense of substantial truth. Time contends that these limitations on its discovery must all be attributed to plaintiff, that the access to important evidence which it has been denied has left it unable fairly to present its case, and that it has therefore been deprived of due process.

These arguments are meritless in light of the context in which the claims involved arose and the facts surrounding Time's inability to obtain the information it seeks. Minister Sharon has cooperated and testified adequately. His refusal to divulge certain information is based upon a reasonable invocation of Israeli secrecy law and justifies neither preclusion nor dismissal. Time, moreover, has had access to ample evidence to enable it to present the defenses it asserts. Finally, Time has not established that the State of Israel is acting in concert with Minister Sharon to deprive Time of needed evidence; rather, the record is wholly consistent with the view that Israel has treated this as a private litigation and that it is attempting in good faith to provide relevant evidence, consistent with its normal security precautions. Time has thus failed to demonstrate that the evidentiary disadvantages it labors under deprive it of fundamental fairness.

### A. The Factual Context and Relevant Issues.

To evaluate Time's arguments concerning the evidence it claims to have been denied, the issues to be tried in this litigation must be kept in mind. First, this is not a case in which the plaintiff has advanced a claim concerning which the defendant should be uninformed, let alone in the total state of ignorance that Time professes. Plaintiff rests his claim on something that Time publicly said it "has

learned"—specifically that Appendix B of the Kahan Commission's Report contains details of Minister Sharon's visit with the Gemayel family at Bikfaya on September 15, 1982, that Sharon "reportedly told the Gemayels that ... he expected the Christian forces to go into the Palestinian refugee camps," and that "Sharon also reportedly discussed with the Gemayels the need for the Phalangists to take revenge for the assasination of Bashir, but the details of the conversation are not known." Article at 29. As the publisher of these words, Time through its reporters can reasonably be assumed to have information in its possession or control about the historical facts that it claims to have learned. Time's correspondents have refused to identify the sources from whom they obtained the evidence that supports Time's story, and they also have refused to reveal fully the information they obtained. *See, e.g.,* Kelly Tr. at 251–52; Halevy Tr. at 129–30, 292. Plaintiff can hardly be faulted for those decisions. Time cannot deprive itself of using information it has and claim at the same time that it has been denied due process. Furthermore, in writing a statement about the contents of a secret appendix, Time's reporters, writers, and editors must have known that they would not have easy access to the document and that Time could later be faced with problems of proof in a suit claiming that the statement was false. This latter fact does not lessen plaintiff's burden of proving falsity clearly and convincingly, but it moderates the equitable significance of any apparent unfairness that results from Time's predictable evidentiary difficulties.

Time correctly claims that it has the right to raise a defense that is broader than the narrow factual statement in the article. Certainly, Time must be permitted to prove substantial truth. Yet it cannot seek to raise issues that are tangential to the claims in this litigation, and then use its lack of evidence on these tangential matters to claim a violation of due process. The more removed a fact is from the basic charge, the less significance a lack of evidence as to that fact should carry. Time

has properly argued that it must be allowed to show that: (1) even if the alleged details are not in Appendix B, they are in some other secret portion of the Report; (2) even if no details of such a conversation are contained anywhere in the report, such a conversation actually took place at the Bikfaya meeting; or (3) even if no such discussion took place at Bikfaya, the discussion alleged occurred just before or after the Bikfaya meeting. Substantially more distant from the core issues, but nevertheless an appropriate subject of proof, is Time's claim that, even if no such discussion took place between Minister Sharon and any Christian leader, Sharon nevertheless may have had meetings with some other persons which establish that after discussing the Phalangists' need to take revenge for Bashir's death, he authorized them to enter the camps.

Time goes even further than this, however, and argues that it must be allowed to prove that, irrespective of any discussions at meetings, General Sharon knew that sending the Phalangists into the camps would result in the massacre of Palestinian civilians, and that he authorized or condoned that result. To this end, Time seeks to litigate the entire history of the Lebanese civil wars, the Israeli invasion of Lebanon, and the relationship of Israel and the Phalangists. Indeed, Time suggests that it wants "a new examination of the material considered and the findings rendered by the Kahan Commission," and accuses Israel of withholding material to prevent such a reexamination. Defendant's Memorandum at 91–92. Time's due process claims are largely undercut by the fact that most of the evidence it has not obtained relates to these broader questions it has attempted to bring into the case. These contentions are far removed from the legitimate issues. They would be important if Time had merely stated in the article at issue that it thought that the Commission was incorrect in finding Minister Sharon not "directly" responsible—an opinion for which Time in any event would have been immune from suit. But the jury may find that Time said

something very different by reporting that the Commission knew, and withheld from the public, details which could reasonably suggest that Minister Sharon condoned or encouraged the massacre as a measure of revenge.

■ A further, general consideration pertinent to evaluating Time's argument is the fact that plaintiff bears the burden of establishing falsity and actual malice by "clear and convincing" proof. *Edwards v. National Audubon Society Inc.*, 556 F.2d 113, 121, *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977); *see Buckley v. Littell*, 539 F.2d 882, 889–90 (2d Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). Defendant's due process claim must be evaluated in the light of these burdens, since plaintiff and not defendant will largely bear the risk of any uncertainty left by the absence of evidence.

The nature of the alleged libel must also be considered in evaluating Time's contentions. Minister Sharon claims that, while he did pay a condolence call on the Gemayels and had a conversation with them, the Commission report contains no discussion of that meeting (in Appendix B or anywhere else), and that he never discussed with the Gemayels or any of the Phalangists, at Bikfaya or anywhere else, the need to avenge the death of Bashir. These assertions must largely be established through denials. The principal exception to this is the Commission Report, which either does or does not contain the discussion of which Time said it had learned. Time's broad alternative arguments make clear, however, how little weight Time may give even to conclusive proof that the Report contains no such discussion. Apart from the Report, some sets of minutes exist of conversations between Minister Sharon and Phalangist leaders, and these would be helpful in establishing the truth of Time's statement one way or the other. But even if proof is obtained that these minutes contain no references to revenge, Time may argue that the minutes are incomplete, or that the discussion must have occurred at a different time, or that the proof of Sharon's intent will be found in minutes of conversations among Israeli leaders, or even that a massive and pervasive coverup exists. *Cf.* Defendant's Reply Memorandum on Actual Malice at 30 ("It is not unreasonable or illogical to believe that [Sharon and the Gemayels had such a conversation] unless they were trying to preserve some smidgin of 'deniability.' "). Thus, the proof of Minister Sharon's denials ultimately must depend upon his credibility and upon Time's proof to the contrary, including impeachment, with Sharon bearing the burden of establishing his version by clear and convincing evidence.

### B. Proposed Preclusion for Refusal to Testify.

Time contends that plaintiff should be precluded from testifying about those subjects concerning which he has refused to answer any questions, a remedy which would likely preclude plaintiff from proceeding to trial. Defendant cannot rely, however, on those cases in which a plaintiff invokes the privilege against self-incrimination. *See, e.g., Wehling v. Columbia Broadcasting Co.*, 608 F.2d 1084, 1088 (5th Cir.) (dismissal may be appropriate where plaintiff's invocation of the fifth amendment privilege requires defendant to "defend against a party who refuses to reveal the very information which might absolve defendant of all liability") *rehearing denied*, 611 F.2d 1026 (1979); *Lyons v. Johnson*, 415 F.2d 540, 541 (9th Cir.1969) (plaintiff cannot "refuse to submit to any discovery whatsoever ... by asserting a fifth amendment privilege ... and then demand that he nevertheless be permitted to continue ... his claim ...") *cert. denied*, 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970). Minister Sharon has consented to substantial discovery, and Time has had access to the information central to its defense through other avenues of discovery.

■ A plaintiff may be precluded from testifying, or even from pursuing his claim, even when the privilege he invokes is involuntary. But if the privilege is fairly in-

voked, then the application of such a remedy must depend on the extent and significance of testimony given, the importance of the evidence withheld, and the prejudice to the party seeking the evidence. Minister Sharon has testified in part, but has refused to disclose any material that he claims he is prohibited from disclosing under Israeli law. His refusal to answer certain questions is fully justified. He has refused to reveal information made confidential by the Commission, or by other laws punishing disclosure. Plaintiff contends he is restricted from publishing any part of the nonpublic material of the Commission and has submitted the affidavit of an Israeli attorney who states that, under section 26 of the Commission of Inquiry Law (1968), "Plaintiff, General Ariel Sharon, is forbidden by law to produce the 2 documents" requested by Time. Affidavit of Pinhas Goldstein at 2. Time countered with the affidavit of another Israeli attorney, Shmuel Barzel, who claims that neither section 26 of the Commission of Inquiry Law nor the decision of the Israeli Cabinet denying plaintiff's application for the release of certain documents constitutes an absolute prohibition against disclosure. Affidavit of Shmuel Barzel at 5–8. Any doubt as to the proper standard is put to rest, however, by a letter from Israel's Ministry of Justice, which recites some of the relevant provisions, *see* Letter from M. Dennis Gouldman (Oct. 15, 1984), and by the letters from Israeli authorities to prospective witnesses, warning them of the violations that could occur if they testified about confidential matters. *See, e.g.,* Letter from Moshe Koshanousky, Legal Advisor to the Defense Establishment, to General Amir Drori (undated) (Affidavit of Paul C. Saunders, Oct. 11, 1984, Exh. D) (Def. Exh. 3) ("It is my opinion that the transfer of information regarding the matter for which you have been summoned and within the framework of legal proceedings as stated above, may apparently be held as an offense of the provisions of law stated above," including sections of the Penal Law, the Military Law, and Army Orders); Letter from M. Ben-Dor, Head of Field Security Department, to General Amir Drori (undated) (Exh. C to Saunders Affidavit) ("I hereby direct you to avoid any transfer of any information or any document relating to [Ariel Sharon's suit against Time, Inc.]"); *see also* Defendant's Memorandum at 25–26 (setting forth instructions of the Israeli Government to Time's witnesses). These grounds for refusing to answer the questions involved are as proper as those invoked by Halevy, who has refused to answer many important questions on the basis of both New York's shield law, *see, e.g.,* Halevy Tr. at 112, 117, 130, and Israeli secrecy laws, *see, e.g., id.* at 135. As the Supreme Court observed in *Societe Internationale v. Rogers,* 357 U.S. 197, 211, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255 (1958): "It is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign."

The material which Minister Sharon has refused to disclose is important, but its significance is diminished in light of the questions he has answered. Sharon refused to disclose the contents of Appendix B (which he has seen), or to reveal the contents of any minutes of meetings or the names of secret service agents. He has, however, answered questions about the subjects connected to these nondisclosures. Thus, he stated that Appendix B contains no discussion of the Bikfaya meeting, and while he refused to reveal his notes of the minutes taken by the Mossad, he testified fully about the meeting itself. He has also made available all the unprivileged documents in his possession or control. The significance of Appendix B is further diminished by corroborating evidence as to its nature and contents from Ehud Olmert, a Knesset member, who described it as a list of names containing nothing of the sort stated by Time in the alleged libel. Olmert Tr. at 7, 57–59. Little more could be said of its contents, apparently, without revealing the names included, which are those of secret service personnel and other confi-

dential witnesses before the Commission. With respect to the minutes of meetings, Kelly testified that Halevy claimed he had seen the notes of the Bikfaya meeting, Kelly Tr. at 186, 192, and Halevy has refused to confirm or deny Kelly's testimony, Halevy Tr. 154–57. That Time's reporter has refused to discuss in any way what he has seen or heard about the Mossad minutes is a deprivation of usable evidence for which Time—not plaintiff—must bear responsibility on the due process issue.

Plaintiff has also refused to surrender the notes he provided his attorneys concerning two documents that are part of the Commission's confidential materials. Time has been denied access to this material on the ground of Israeli secrecy law, while plaintiff's lawyers have seen it. Mr. Barzel's affidavit asserts that, if disclosure of information about the documents sought by Time represents a violation of Israel's Secrecy Law, then disclosure to Sharon's attorneys also constitutes a violation. Affidavit of Shmuel Barzel at 5–6. This proposition may be correct, but the question remains whether Minister Sharon, by revealing information about the confidential documents to his American attorneys, thereby gave up his right to refuse disclosure of the information to the court and defendant. Should he be required now knowingly to violate the laws of his country because he unintentionally may have done so earlier?

Time concedes that it possesses in full an article written by two Dutch journalists whose statement to the Commission represents one of the two documents about which Minister Sharon has notes which he refuses to provide. Time's reporters indicate, moreover, that Time has seen or had access to the second document concerning which plaintiff has notes—the minutes of plaintiff's condolence call at Bikfaya. The possibility of prejudice from nondisclosure of the notes is therefore virtually nonexistent. Moreover, a request is now pending before the Israeli Government to obtain access to information about the documents on which the notes were based. Time therefore may well have access to both documents in some form before the litigation is over.

On the present record, therefore, where the assertion of an involuntary privilege is soundly based in foreign law, where the importance of the evidence withheld is largely mitigated by the availability of other evidence and indeed by Time's own access to the same evidence, and where no showing of substantial prejudice has been made, an order of preclusion would be inappropriate.

### C. Time's Due Process Claim.

Time claims that actions of the State of Israel to deny it access to evidence, taken in combination with General Sharon's nondisclosures, have deprived Time of a fair opportunity to defend itself. These claims are based on Time's exaggerated view of the relevant issues, and its unproven claim that Israel is somehow working with General Sharon to prevent Time from gaining access to documents and witnesses. In fact, Time has available to it a huge amount of evidence to test even its broadest claims, and the State of Israel has thus far reacted to the requests placed before it in a manner consistent with a good-faith desire to cooperate while at the same time preventing the unwarranted disclosure—intentional or inadvertent—of materials its laws normally mandate be kept confidential.

▆ In pressing its due process argument, Time attempts to link General Sharon and the State of Israel, so that Sharon can be held responsible for the acts of the latter in refusing access to information. Where a party to a litigation is denied information by a third party, the established rule is that the litigation simply proceeds without the information sought. *See McCormick's Handbook of the Law of Evidence* § 109, at 233 (E. Cleary ed. 1972). No penalty is imposed as long as the opposing party is not responsible for preventing access. 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 509[10], at 509–68 (1980) (sanctions against a party are inappropriate

where neither party is responsible for the suppression of the evidence).

██ Time points to a variety of facts it views as evidence of joint action by plaintiff and the State of Israel with respect to this litigation, including plaintiff's testimony that he brought this suit after determining that the then Prime Minister, Menachem Begin, did not object; the fact that the State of Israel has paid Minister Sharon's air travel expenses to this country on at least one occasion; and plaintiff's position as a member of the Cabinet and possibly still as a member of the Ministerial Committee that passed upon his original disclosure request. Time also alleges common interests between plaintiff and the State of Israel in that neither wants to reopen the Kahan Commission investigation to permit a wide-ranging inquiry into General Sharon's—and hence the State of Israel's—responsibility for the massacre. Finally, Time presents in affidavits of counsel information about how Israeli officials have blocked access to various witnesses. Thus, when Time managed to serve deposition subpoenas within the United States on General Drori and on an alleged Mossad officer who Time claims was the notetaker at Bikfaya, both were placed on Israel's list of diplomatic officers, and thereby made immune from demands for their testimony. And after Time provided Israeli authorities with a list of persons who Time wished to examine in Israel, those persons received letters warning them that giving any information to Time concerning this case could lead to military or criminal prosecution. Time notes that among these persons were some willing witnesses, including Mr. Uri Dan, who agreed to be deposed but refused to respond to questions because of his Government's warning. *See* Defendant's Memorandum at 45–55.

The circumstances linking plaintiff to his government do not establish that the State of Israel authorized or approves of this litigation. Time's characterization of Minister Sharon as Israel's "champion" is more a tactical effort to make plaintiff aware of the risks of pressing his case than a proven proposition. While Minister Sharon may perceive himself as a champion of the Jewish people, this perception is a common affliction suffered by leaders espousing a wide spectrum of often conflicting views, and it provides Sharon with neither legal nor moral authority to speak for all Jews or for the State of Israel. Sharon's admission to having received his air travel expenses for one trip is accompanied by his uncontroverted claim that he is entitled to have travel expenses paid without regard to the business he is conducting. All that Time has shown is that Prime Minister Begin did not prevent Sharon from filing his complaint, and that the Israeli Government has not ordered Minister Sharon to terminate the case. These facts fail to establish either that the former Prime Minister approved of this action, or that the State of Israel wants it to proceed. To order Minister Sharon to terminate the litigation could be regarded as an improper interference in his private affairs; such an end might not be as easily accomplished as Time believes, given the widely known political influence wielded by plaintiff as a member of the delicately fabricated coalition that governs that extravagantly democratic nation.

Time has also in part created its own problems through its very broad requests for documents and depositions. The document list drawn up by Time and presented to both the Israeli and American governments calls for everything conceivably relevant to the war in Lebanon, rather than focusing on the issues in this case. In quashing subpoenas which Time served on the Central Intelligence Agency, the National Security Agency, the Department of Defense, and the Department of State, Judge Norma Johnson characterized Time's list as a "sweeping unfocussed request for documents, in many instances without limitation, [and which] makes no effort to demonstrate relevance." Order, *Sharon v. Time, Inc.*, Misc. No. 84–0204 (D.D.C. Aug. 29, 1984). In addition to placing similarly broad requests for documents before the Israeli government, Time originally asked to depose forty-three witnesses, including

the heads of Israel's security forces. This request was voluntarily limited to about ten witnesses, at the Israeli government's suggestion, but Time has no doubt created the impression in Israel that it is being indiscriminate in its requests. Furthermore, Time's unilateral efforts to depose the two potential witnesses it found in the United States must have caused great concern for Israeli authorities, who had not yet ruled on the extent, if any, to which those witnesses would be allowed to testify; Time's effort may yet lead to the exposure of an Israeli secret service agent's identity, a matter of grave concern to any government. Time's efforts in this regard are not at all "reprehensible," as plaintiff's counsel claims. If the alleged agent was in fact the notetaker at Bikfaya, his testimony would be central to Time's defense. Plaintiff must share the moral responsibility for improper exposure of secret information in this litigation, since he must have known that the litigation would impinge upon sensitive security interests of the State of Israel. Nevertheless, the manner and timing of Time's actions could well have prejudiced, or at least delayed, its chances of obtaining cooperation in a form that satisfies both defendant's and Israel's needs.

Time argues that its requests could not have been overbroad, because the court approved them. The court explicitly warned Time, however, that its broad requests could be ineffective. See, e.g., Transcript of July 23, 1984 Hearing at 9. And when the court wrote informally to Israel for information on behalf of both parties, a conscious effort was made—to which Time to its credit ultimately acceded—to emphasize the importance of the handful of exhibits pertaining directly to the alleged libel.

Turning to the evidence Time claims it has been denied, only a small portion relates to the central issues in this case. Time has not as yet been given access to Appendix B, or to the notes of meetings between General Sharon and the Phalangists at Bikfaya and Karentina. These deprivations are significant, but their effects must be placed in context, and cannot now be finally determined. Evidence about these matters has emerged, and thus far it has all contradicted the allegations in "The Verdict is Guilty." We cannot know, moreover, exactly what Time's personnel have seen or heard, and what evidence they could give if they chose to testify about these matters. Halevy is of course available to Time to explain how he came to learn the facts in his story, and Kelly is available to testify as to how he confirmed those facts. The press is privileged to refuse to reveal sources, but the privilege cannot be used by Time to help create a basis for the argument that it cannot defend itself. In a similar vein, the Justice Department has asserted in its memorandum in support of its motion to quash Morris Draper's subpoena that Time should not be permitted discovery of sensitive and confidential information from the United States government that relates to tangential issues in the litigation when Time refuses to reveal information possessed by its own sources that is directly relevant to the core issues in the case. See Memorandum of Points and Authorities in support of Motion to Quash Subpoena at 1, 4 & 6, Sharon v. Time, Inc., No. F.S. 84-0549 (D.D.C.1984). Finally, with respect to these narrow and central aspects of the litigation, efforts of the court and parties to obtain evidence from the State of Israel have some prospect of success. In a recent letter responding to Time's request for information, the Attorney General for the State of Israel informed Time's Israeli counsel of his decision to allow Time to take the testimony of five witnesses, provided that certain conditions are met to prevent injury to the security of Israel. Citing security considerations, the Attorney General denied Time's request to take the testimony of five other persons and for discovery of documents. See Letter from Yitzhak Zamir to Haim Zadok (Nov. 6, 1984). The Israeli Ministry of Justice is now at work on specific proposals for access pursuant to this court's request, and a positive response of substance would put to rest any possible claim of unfairness.

Most of the evidence that Time has sought from General Sharon—and particularly from the State of Israel—pertains to Time's very broadest claims and theories. Time is seeking to establish, for example, that plaintiff must have known a massacre would occur when he approved the plan to allow the Phalangists to clear the camps of terrorists. To prove this, Time wants to show that the history of relations between the Phalangists and the Palestinians had been one of massacres and revenge; that plaintiff was aware of this history; and that plaintiff was specifically advised that a massacre would likely result from the plan he had approved. Time argues that, even if it is found to have falsely defamed plaintiff in the specific manner alleged, it must be permitted to attempt to prove that plaintiff in fact condoned or approved the massacre. Time's witnesses, and the documents it seeks, have little or nothing to do with the alleged libel, but appear instead to be needed to prove this sweeping defense, based on the proposition that, if a jury finds that General Sharon condoned or approved the massacre simply by allowing the Phalangists to enter the camps, then Time would have established the substantial truth of its alleged statement. *See* Defendant's Reply Memorandum at 54–55 n. 22.

To the extent that Time will be permitted to introduce evidence on this theory of its case, that evidence will not be admissible to establish the truth of its published statement. A material difference exists between Time's saying that, in its view, the evidence shows that Minister Sharon approved the massacre by doing nothing to prevent what he anticipated, and the statement that Time actually made, which can be read to suggest that Sharon actively participated in discussions with Phalangist leaders concerning the subject of revenge and that the Commission kept secret the details of those discussions. Time can prove the substantial truth of the statement it published only by establishing the existence of something in the Report itself, in the Bikfaya minutes, or in some other form, showing that Minister Sharon dis-

cussed with the Phalangists the need to avenge Bashir's death, or engaged in some similarly inculpatory discussion with them.

Time already has ample evidence to place its broad theory of culpability before the jury in a full and fair manner. Indeed, Time proclaims throughout its papers, with great assurance, that the extensive evidence made public by the Commission—and largely stipulated to by plaintiff—will establish plaintiff's "direct" and knowing responsibility. Time claims it "will demonstrate: (i) that Minister Sharon condoned the massacre; (ii) that he lied to the Kahan Commission; and (iii) that the finding of 'indirect responsibility' by the Commission was wrong—Sharon bears 'direct responsibility' for the massacre." Defendant's Memorandum at 56. All the evidence referred to by Time in arguing this position, including the Commission's findings, is available to Time to place before the jury for any appropriate purpose. Time's need for more is questionable, with the exception of unpublished evidence that bears directly on General Sharon's actions and state of mind immediately before the massacre.

## IV. Actual Malice

Libel plaintiffs who are either public officials or public figures must prove both falsity and actual malice to recover. *See, e.g., Bose Corp. v. Consumers Union Inc.,* —— U.S. ——, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *Time, Inc. v. Pape,* 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45 (1971); *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 725–26, 728–29, 11 L.Ed.2d 686 (1964). The parties properly assume that Ariel Sharon, as a minister of a foreign government, is a "public official," or, in any event, a "public figure." A defendant acts with actual malice when it publishes a statement either "with knowledge that it was false or with reckless disregard of whether it was false." *New York Times*

**564**

*Co.,* 376 U.S. at 279–80, 84 S.Ct. at 725–26; *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 154, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967).

"The *New York Times* actual malice standard is deceptively simple: knowing falsity or reckless disregard of the truth or falsity of the defamatory statement." *Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 537 (7th Cir.1982). This deceptive simplicity stems in large part from the fact-intensive nature of the actual malice inquiry. "'Reckless disregard' ... cannot be fully encompassed in one infallible definition. Inevitably, its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law." *St. Amant,* 390 U.S. at 730–31, 88 S.Ct. at 1325.

 Four principles, however, are clear. First, the actual malice standard is subjective: "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325 (emphasis added). Concomitant with this subjectivity is a temporal element: actual malice rests on the defendant's state of mind at the time of publication. *See Bose,* 104 S.Ct. at 1966 (evidence must establish that defendant "realized the inaccuracy at the time of publication"). Second, the plaintiff must prove actual malice with "convincing clarity." *New York Times,* 376 U.S. at 285–86, 84 S.Ct. at 728–29; *Yiamouyiannis v. Consumers Union,* 619 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980). To defeat a defendant's motion for summary judgment, then, a public figure plaintiff must point to facts in the record from which "a reasonable jury *could find* malice with convincing clarity." *Yiamouyiannis,* 619 F.2d at 940. Third, a plaintiff is entitled to rely on circumstantial evidence to prove that a defendant published with actual malice, including the defendant's conduct. *Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979); *see St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326 (defendant's statement that he believes statement to be true cannot "automatically insure a favorable verdict"). Fourth, a plaintiff may prove the actual malice of a press defendant by relying on the acts of all of the defendant's employees performed within the scope of their employment. *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 253, 95 S.Ct. 465, 470, 42 L.Ed.2d 419 (1974). Ultimately, where "sufficient evidence" is presented either of actual knowledge of falsity, or "to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," it is the finder of fact who "must determine whether the publication was indeed made in good faith." *St. Amant,* 390 U.S. at 731–32, 88 S.Ct. at 1325–26.

*A. The Relevant Background.*

The Kahan Commission Report sets out in some detail the background against which the events of mid-September 1982 took place. *See* Report at 6–12; *see also* Defendant's 3(g) Statement ¶¶ 1–6. Lebanon, which shares Israel's northern border, had been the scene of bitter civil and religious warfare since 1975. On June 6, 1982, Israel launched the "Peace for Galilee" war to end PLO terrorist attacks from Lebanon and to aid its Christian Lebanese allies, the Phalangists. The IDF quickly took over the suburbs of Beirut and completely encircled the Syrian and PLO forces. An evacuation of PLO fighters was ostensibly completed with the help of a multinational force by September 1, although the PLO apparently left behind a number of men as well as many arms. Throughout this period, despite the fact that the war benefited the Phalangists, the IDF did virtually all the fighting. "This state of affairs aroused criticism and negative reactions from the Israel public and among I.D.F. soldiers as well. As the number of I.D.F. casualties mounted, public pressure for the

Phalangists to participate in real fighting increased." Report at 10, 11. The Israel Cabinet therefore adopted a plan under which the Christian forces would be responsible for entering and taking control of West Beirut.

On Tuesday, September 14, 1982, the situation in Lebanon changed radically. Bashir Gemayel, the son of the Phalangists' leader Pierre Gemayel and Lebanon's president-elect, was assassinated by a bomb planted in a building in Ashrafiyeh, Beirut, where he and other Phalangists were meeting. During the afternoon, a number of meetings were held involving plaintiff, Lieutenant General Rafael Eitan (the IDF Chief of Staff), the heads of the various intelligence agencies, and the Prime Minister. By late Tuesday night, the Prime Minister, Minister Sharon, and Eitan had agreed that the IDF should enter West Beirut to try and maintain calm. A number of orders were issued. Among these was one stating that "[t]he refugee camps are not to be entered. Searching and mopping up the camps will be done by the Phalangists/Lebanese Army." Report at 13. That night, Eitan flew to Beirut, met with Israeli commanders, and then went to Phalangists' headquarters where he told the Phalangists to prepare for military action. He also told them that the IDF would not enter the refugee camps, but would leave this facet of the operation to the Phalangists.

On Wednesday, September 15, the IDF entered West Beirut. The entry was generally successful, although heavy fire from the refugee camp in Shatilla halted the IDF's progress. A few hours after the operation began, Minister Sharon arrived at the IDF's forward command post, a building roughly two hundred yards from the outskirts of Shatilla. There, he met with Eitan, who told him that the Phalangists had been informed of Israel's plans and that the Phalangists would enter the camps. Thereafter, Sharon, Major General Yehoshua Saguy (Director of Military Intelligence), the head of the General Security Services, and some Mossad agents went to a meeting at Phalangist headquarters in the Karentina section of Beirut. Sharon informed the Phalangists that the IDF would be securing a number of focal points and junctions in West Beirut but that the Phalangists would also be entering the area and "should maintain contact with Major General Drori, G.O.C. Northern Command, regarding the modes of operation. A record of this meeting was made by Intelligence officer B (Exhibit 28)." Report at 16. "From there the Minister of Defense went to Bikfaya, to the Gemayel family home, to pay a condolence call." *Id.*

At his deposition, Sharon testified in detail about his condolence call. He arrived in Bikfaya, the Gemayels' ancestral village, sometime between 11:00 a.m. and noon. Sharon Tr. at 55 (Sept. 5, 1984). He met with Pierre and Amin Gemayel in the presence of Saguy, Uri Dan (Sharon's press attache), the chief of the security services, and two Mossad agents. *Id.* at 63–64. Sharon is absolutely certain that, although hundreds of Lebanese were milling around outside the house and some other people were in the large room in which the meeting took place, no one outside his immediate party could overhear his conversation with Pierre Gemayel. *Id.* at 66–67. He also testified that neither Fadi Frem, the commander of the Phalangist general staff, nor Elie Hobeika, chief of the Phalangists' intelligence division (who later commanded the Phalangists at Sabra and Shatilla and apparently ordered the killing of women and children found in the camps, *see* Report at 22), was in the room. Sharon Tr. at 66, 69–70. Sharon said he conveyed the condolences of the Prime Minister to the Gemayels, and expressed the view that Israel hoped the two nations would continue to develop good relations, as had been planned with Bashir. "I told them the Israeli forces were moving into West Beirut." The meeting then ended after some remarks by Pierre Gemayel thanking Israel for its assistance and expressing his hope that relations would continue to develop. *Id.* at 73–76. According to Sharon, no discussion took place of revenge, the Palestinian issue, or the refugee camps. *Id.* at 77,

79. One of the Mossad agents accompanying Sharon took notes of the meeting, *id.* at 79, which as far as Sharon knows was the only set of notes taken, *id.* at 81. Sharon testified that he had reviewed the notes, and "there is nothing there about any possibility or any encouragement or any urging or any discussion with the Gemayel family about the need to take revenge or anything which is similar to that." *Id.* at 295. Following this meeting, Sharon left Bikfaya and returned to Israel.

A few minutes after Sharon's departure from the Gemayels' home, Time's correspondent in Israel, David Halevy, arrived in Bikfaya to cover Bashir Gemayel's funeral. Halevy Tr. at 124. Halevy paid his condolences to Amin and Pierre Gemayel, who were standing on a receiving line. *Id.* at 120, 147–48. Someone, apparently a Lebanese commander, informed him that Sharon had been at the Gemayels' but had just left. *Id.* at 125. Halevy then went to the church to view Bashir Gemayel's body, followed the coffin procession to the main square, and listened to the speeches. *Id.* at 126–27. "I think this is the moment where it was very clear that something is going to happen, because [Amin Gemayel] said, 'We will revenge you, my brother, Bashir.' Something in that form...." *Id.* at 127.

While in Bikfaya, Halevy had two long conversations. During his deposition, Halevy refused to identify or describe in detail the persons with whom he talked. Halevy's account suggests that one of them was a Lebanese and the other a Mossad agent. Halevy testified that the Lebanese mentioned that the IDF was entering West Beirut "'and we will participate or get involved or will share or will be part of that military operation.'" *Id.* at 131. Halevy also spoke with one of the Mossad agents he saw in Bikfaya, who he later identified as the agent who took the notes at the September 12 meeting between Sharon and Bashir Gemayel, and at the condolence call. *Id.* at 136, 140. This Mossad agent told Halevy that the political situation in Lebanon was "unstable and shaky," and that Israel's position had been seriously weakened by the assassination. *Id.* at 139. Ha-

levy had no conversations that day in Bikfaya in which Sharon's name was mentioned in any significant context.

Late the next day, Thursday, September 16, the Phalangists entered the refugee camps of Sabra and Shatilla. At a Cabinet meeting shortly thereafter, General Eitan explicitly discussed the possibility of massacres in retaliation for the assassination of Bashir. Late Friday night, General Eitan informed Minister Sharon that the Phalangists had "gone too far" in the treatment of the Palestinians, that the Phalangists had been prevented from letting additional forces enter the camps, and that all the Phalangists were to leave the camps by 5:00 a.m. Saturday, September 18. Report at 37. The Phalangists did not leave until 8:00 a.m.

> [I]t then became apparent that in the camps, and particularly in Shatilla, civilians—including women and children—had been massacred. It was clear from the spectacle that presented itself that a considerable number of the killed had not been cut down in combat but had been murdered, and that no few acts of barbarism had also been perpetrated. These sights shocked those who witnessed them; the reports were circulated by the media and spread throughout the world.

*Id.* at 42.

A public furor erupted when news of the massacre reached Israel. For two weeks, massive demonstrations occurred in the streets, and bitter debates took place in the Knesset, many of them centering on plaintiff's role. On September 28, 1982, the Cabinet agreed to establish the Kahan Commission to determine "all the facts and factors connected with the atrocity carried out by a unit of the Lebanese Forces against the civilian population in the Shatilla and Sabra camps." Report at 1. The Commission held some public sessions, but much of its work was done *in camera.* *See* Report at 1–3.

Ariel Sharon testified in both a public and a secret session. On October 25, 1982, he gave his public testimony. He repeated-

ly expressed his total surprise at the massacre. *See, e.g., Transcript of Testimony of Defense Minister Ariel Sharon Before the Commission of Inquiry Investigating the Events of the Refugee Camps in Beirut, 25.10.82,* State of Israel Press Bulletin at 3, 15 (Oct. 26, 1982) (Def.Exh. 21) ("Sharon Commission Testimony"). Sharon discussed his knowledge of the Phalangists' attitude toward the Palestinians, stressing his belief that, although they had killed many civilians prior to Israel's invasion, such behavior was a thing of the past. Sharon Commission Testimony at 4–5. In response to a question from Justice Barak asking whether the possibility of vengeance for Bashir Gemayel's assassination should have been a relevant consideration in the decision to have the Phalangists enter the camps, Sharon said:

> With the Commission members' permission, I would like to say a word on the subject of vengeance as I know it among the Arabs. Accepted revenge among the Arabs does not include children, women, and old people. There are certainly more expert Arabists than I, yes: I say this in light of my information, my experience. Revenge exists, without a doubt ... Amin himself, at the funeral, to the best of my recollection, at the funeral on the 15th of the month, used the word "revenge." The word revenge also appeared, I would say, in discussions among us ... But I do not recall even in one remark ... revenge attributed between one defined sector and another defined sector ... It wasn't attributed to massacres of entire populations, or of hundreds of people, as, to our shock, we afterwards discovered.

*Id.* at 8 (ellipses in original). Later, Sharon specifically discussed the two meetings on the morning of September 15:

> Barak: Could you tell us, in that meeting with the Phalangists [at Karentina], was something said about the possibility of massacre, or of killing women and children, in the form of a warning that they not do this thing, or in some other form?
> Sharon: The answer is—no. We didn't go into any detailed discussion. What

exactly was said there I will read to you afterwards [during an *in camera* session]. From that place I went to a meeting at, a condolence call in Bikfaya, to Pierre Jemayel, the father.

*Id.* at 14.

During the fall, while the Kahan Commission was deliberating, rumors were reported in Israel and in the international press that Sharon had known about the Phalangists' plans before they actually carried out the massacres. A number of such press reports are set out in Defendant's Memorandum at 11–14 and Defendant's Reply Memorandum on Actual Malice at 37–39. Only three of the many reports defendant cites mention the Bikfaya meeting: (1) "You Have To Kill Palestinians While They're Still Small," which appeared in the German newsweekly *Der Stern,* Sept. 30, 1982 (Def.Exh. 8); (2) "What Sharon Told Pierre Gemayel," *Koteret Rashit,* Dec. 15, 1982 (an Israeli publication) (Def.Exh. 10); and (3) "Sharon Warned of Bloodbath," *Provinciaalse Zeewse Courant,* Dec. 11, 1982 (a Dutch newspaper) (Def.Exh. 11). No one at Time claims to have read the Dutch article prior to the publication of "The Verdict Is Guilty," and it is unclear whether anyone actually read the piece in *Koteret Rashit.* In any event, both these articles appeared *after* Halevy sent his initial report to Time, so neither could have provided Halevy with any support. The only one of these articles which anyone testified to having read was the *Der Stern* story, which Halevy believes he saw excerpted in the Israeli press, Halevy Tr. at 196; this piece did not describe its sources, and Halevy does not claim to have relied on it.

## B. Halevy's World Wide Memo Item.

The paragraph at issue in this lawsuit originated on December 6, 1982, while the Commission was deliberating, and while rumors about Sharon and others were being circulated. Halevy claims to have received confidential information at that time, which led him to write an item for Time's World Wide Memo, a weekly internal communica-

tion "which reports information from correspondents which, though not pegged for use in a specific article, may nevertheless prove useful or interesting to Time's editorial staff." Defendant's Memorandum at 118 n. 60 (citations omitted). Halevy's item ran as follows in the World Wide Memo:

### Green Light for Revenge?

(Halevy—Jerusalem) The most crucial findings of th[e] State Inquiry Commission investigating the Sabra and Shatila massacre might turn out to be the newly discovered notes which were taken during a conversation between Israel's Defense Minister Arik Sharon and leaders of the Gemayel clan. Sharon came to the Gemayels' home village, Bikfaya, the morning after Bashir Gemayel was assassinated. He came actually to convey his and the Begin government's condolences. When Sharon landed at Bikfaya he had with him only one senior Israeli intelligence officer, who went with Sharon to the meeting and took notes during the private session.

According to a highly reliable source who told us about that meeting, present were not only Pierre and Amin Gemayel but also Fadi Frem, the Phalange Chief of Staff who is married to Bashir's sister. Sharon indicated in advance to the Gemayels that the Israeli army was moving into West Beirut and that he expected them, the Force Lebanese, to go into all the Palestinian refugee camps. He also gave them the feeling after the Gemayels' questioning, that he understood their need to take revenge for the assassination of Bashir and assured them that the Israeli army would neither hinder them nor try to stop them.

These minutes will not be published at all, in any form whatsoever, as they indicate a direct involvement and advanced planning by the Gemayel family, including Lebanon's president, Amin Gemayel.

Time World Wide Memo (Dec. 6, 1982) (Def.Exh. 17).

While writing this memo item, Halevy referred to both Sharon's public testimony and his own notes, which were heavily re-dacted by the Israeli military censor prior to their production at Halevy's déposition. Halevy claims he had between eight and fifteen sources for the item. *Id.* at 110. But he relied almost exclusively on three sources in writing the file. He asserted that his sources were thoroughly reliable, and that he had received information from them before, but he declined repeatedly to give any identifying information about his sources, and failed to give any evidence of their reliability or to identify a single instance in which the particular sources had supplied reliable information. *See e.g., id.,* at 112, 113, 117, 165–67. Furthermore, although Kelly testified that Halevy told Kelly that a trustworthy source had shown him the "newly discovered" minutes of the Bikfaya meeting, Halevy refused to say whether he had obtained a summary of the minutes from his source or had seen the notes himself, because he said that to answer the question would reveal information about his source. Halevy Tr. 154–55, 446. Kelly Tr. at 186, 188–89, 192.

Halevy claims to have relied above all on Sharon's public testimony for support for his statement that Sharon gave the Gemayels the feeling that he understood their need for revenge and would not interfere:

[O]n top of everything, it's Mr. Sharon's public testimony before the Kahan Commission [during which he said] . . . "The matter of revenge was discussed among us." There is a very clear reference, to the best of my understanding, of that part of his testimony, that he's referring to after the Bashir Gemayel assassination, that he's referring to meetings with the Phalange or with the Lebanese officials.

Halevy Tr. at 281–82. Sharon did publicly state that "the word revenge also appeared in discussions among us," Sharon Commission Testimony at 8, but the phrase "among us" appears to have been intended to refer to his discussion with other Cabinet members and officers, and the Commission certainly understood it as such. If the "matter of revenge" was *discussed* by Sharon and the Gemayels and this fact was

revealed publicly by one of the participants in mid-October, Halevy's qualification of his report to suggest only a nonverbal communication by Sharon would have had no significance. Furthermore, why would Halevy treat as newsworthy and describe as potentially "crucial" the discovery of notes stating little more than the information to which Sharon had already testified, according to Halevy's present reading of Sharon's testimony? Neither Halevy nor, apparently, anyone else reported that Sharon had testified about Israeli-Phalangist meetings at which revenge was discussed. Plaintiff notes that the phrase translated from his Hebrew testimony as "among us" is from the Hebrew word "etslenu," more accurately translated as "among ourselves," or "in our place," a phrase which in other words strongly connotes "among Israelis." Sharon Tr. at 350, 355, 361. While defendant correctly points out that it is Halevy's interpretation of the phrase which is relevant for assessing actual malice, *see Bose Corp.,* 104 S.Ct. at 1966, Halevy's claimed understanding is so questionable in context, and his conduct so inconsistent with his current rationalization, that a jury could find Halevy knew that Sharon's testimony provided no support for his Memo item, and moreover that he is not truthful in claiming that it did.

Halevy repeatedly stressed at his deposition that, at the time he wrote the Memo item, he believed the newsworthy angle of his report did not concern Sharon at all, since Sharon "definitely was not involved in what happened in the camps." Halevy Tr. at 317. Rather he claimed that it concerned primarily the deep involvement of the Gemayels, and the fact that Israel's desire not to embarrass its ally had led to a decision not to publish the minutes of the condolence call. *See, e.g., id.* at 318–19, 325, 394, 439. The question of Israeli responsibility for the events at Sabra and Shatilla was a constant topic of conversation in Israel during December 1982, and the conduct attributed by Halevy to Sharon was significant enough to enable a jury reasonably to disbelieve Halevy's claim

that he thought his story did not materially bear on Sharon's culpability.

Halevy disclaimed any intention to suggest in his Memo item that Sharon had known in advance that a massacre would occur or that he had condoned a massacre. When he wrote that Sharon "gave [the Gemayels] the feeling ... [that] he understood their need to take revenge for the assassination of Bashir and assured them that the Israeli army would neither hinder them nor try to stop them," he says he did *not* intend to suggest that Sharon explicitly discussed the subject of revenge. Halevy Tr. at 276–80. When asked why the item was entitled "Green Light for Revenge?," he claimed, first, that he did not remember adding "for Revenge?" and thought that those words might have been added by the London bureau chief who compiled the World Wide Memo for that week. *See* Halevy Tr. at 375; Duncan Tr. at 151. No document or witness supports Halevy's suggestion, although Time's files in Jerusalem would presumably be expected to contain copies of such memos in the form submitted to Israel's military censors. Furthermore, the notion that Halevy entitled a story "Green Light?" seems at least dubious, and in any event that title conveys essentially the same meaning as "Green Light for Revenge?" Halevy attempted to explain the caption as "a very clear accusation of direct involvement and advanced planning on behalf of the Gemayel family. ... As far as Mr. Sharon, look, the language is rather clear. He gave them the feeling." Halevy Tr. at 394. The title actually used logically suggests that *someone* gave the "green light" to someone else. The transitive nature of the heading, combined with the information in the body of Halevy's report, strongly suggests that Sharon gave the Gemayels an indication that their plan for revenge would be permitted. A jury could reasonably conclude that Halevy meant thereby to suggest both that Sharon knew of and condoned in a face-to-face meeting some unspecified but impending plan of Phalangist revenge. And in reaching this conclusion the jury

could also reject Halevy's testimony that he meant to convey no such meaning.

Sometime after distribution of Halevy's World Wide Memo item, Harry Kelly, then the Jerusalem bureau chief, talked to Halevy about his sources. Kelly Tr. at 250. Kelly believes that Halevy told him that Source B told Halevy about the notes and that Halevy then went to Source A who, according to Kelly's recollection of this discussion, showed the notes to Halevy. *See id.* at 186, 188–89, 192, 207. Kelly testified that Halevy identified Source A to him by name and explained why he felt that Source A was in a position to have access to the notes. Kelly refused to divulge any of this information to plaintiff, both to protect Halevy's sources and because he has forgotten Source A's name. *Id.* at 251–54. Kelly did state, however, that he believed that Source A was involved in military intelligence work, although he does not remember whether Halevy told him that Source A actually was at the Bikfaya meeting. *Id.* at 255–56.

Confronted with Kelly's testimony about the conversation, Halevy stated that Kelly probably had the better recollection of the discussion. Halevy Tr. at 323. He refused, however, either to confirm or to deny Kelly's statement that Halevy claimed to have seen the notes: "Mr. Kelly is entitled to his answer. I'm entitled to my answer.... I [think] that Mr. Kelly gave you too much information about the sources." *Id.* at 157. By ascribing the information in the memo item to "a highly reliable source," however, Halevy implicitly suggested that he had not seen the notes himself. It thus remains possible that Halevy deliberately misled Kelly as to the reliability of his report. Furthermore, whether Halevy told Kelly he had actually seen the notes may have special significance in this litigation. A jury could find that Halevy now refuses to confirm having told Kelly he had seen the notes, because the parties may obtain access to the notes, and they may not support Halevy's story.

That Kelly questioned Halevy as to his sources for a World Wide Memo item, be-

fore any request for clearance of the item had been made, may itself be significant. The World Wide Memo is an "intraoffice publication," intended "[t]o allow reporters at Time to serve up tentative information, information which has not been thoroughly checked out, but which they are working on, or to pass on some gossip occasionally." Duncan Tr. at 140, 141. Time requires that no information in a World Wide Memo be used in a story unless the correspondent who submitted the item "clears" it for publication. *Id.* at 140; *see* Pl.Exh. 5. Kelly nevertheless questioned Halevy, perhaps because Halevy's use of sources had drawn the attention and concern of Richard Duncan, Time's Chief of Correspondents in New York. In the summer of 1982, when Kelly was appointed Jerusalem Bureau Chief, Duncan told him to be especially careful about Halevy's use of sources for politically sensitive stories. Duncan Tr. at 248–50; *see also id.* at 363 (Duncan wanted Kelly to be involved in how Halevy characterized his sources). In December 1982, after Halevy filed his World Wide item, Duncan "initiated" a conversation in which he asked Kelly "if he looked into Halevy's sources on that matter and if he was comfortable with it." *Id.* at 179. Duncan does not remember another World Wide item ever prompting him to call a bureau to discuss its accuracy or reliability. *Id.* at 413.

The basis for Duncan's concern may also be significant to a jury in evaluating the actual malice issue. David Halevy has been a Time correspondent since 1976, and during that period Time has publicly noted his resourceful and daring journalism. *See, e.g.,* "A Letter from the Publisher," Time, Mar. 27, 1978, at 2 (recounting Halevy's eyewitness account of Palestinian hijacking of Israeli bus) (Oran Aff. Exh. 8); "A Letter from the Publisher," Time, July 12, 1976 (describing Halevy's reporting on Entebbe rescue) (Oran Aff., Exh. 7). On at least one occasion, however, Time found "unsatisfactory" verification of a story by Halevy entitled "Fears for Begin's Health." Time, Sept. 24, 1979, at 39. The story reported that Menachem Begin, then

Israel's Prime Minister, was suffering from such poor health that he had been secretly examined by three non-Israeli neurological experts who recommended that he work no more than three hours a day. Following a denial from the Israeli government, Time printed this retraction:

TIME has rechecked all aspects of its story, which was based on what it believed was firsthand knowledge of a meeting between Prime Minister Begin and three consulting neurologists. Time was apparently misled as to the meeting and regrets the error. Time stands by its report that for a period of weeks following his stroke on July 19, the Prime Minister's workload was significantly reduced.

Time, Oct. 22, 1970 (Pl.Exh. 17).

The decision to issue this retraction followed a thorough investigation of Halevy's reportage by Dean Fischer, then the Jerusalem Bureau Chief, and Duncan. In a confidential memorandum to senior Time officials, Duncan wrote: "I believe that our story is wrong. Inescapably, that conclusion then requires a further decision as to whether Halevy was either (a) inexcusably shoddy in his reporting or (b) intentionally misled us, *or* (c) was the victim of an incredibly well orchestrated disinformation plot." Memorandum from Dick Duncan to Henry Grunwald, Ralph Graves, and Ray Cave at 1 (Sept. 26, 1979) (Pl.Exh. 4) (emphasis in original). Duncan's memorandum detailed the way in which Fischer had investigated Halevy's use of sources for his information. Halevy gave four original sources for his story and one confirmation source, who was quoted by name in the article. Fischer spoke to all but one, Source B, whom he viewed "only as a tipster and a close friend of Halevy's." *Id.* at 2. Source A "denied any knowledge that the meeting had taken place and that he was [Halevy's] source." *Id.* Source C "said the story was 'fantastic.'" *Id.* Source D, whose denial Duncan viewed as "very disturbing" said that "his wife, not he, answered the phone when [Halevy] called." *Id.* Finally, Dr. Jack Fein, who was identified as one of the doctors present at the secret examination and who was quoted in the published article, told Fischer that Halevy "'never asked me specifically if I was in attendance'. Fein denied having any knowledge of the examination." *Id.* Halevy's story had been filed despite the fact "that Fischer supervised Halevy closely during the reporting, questioning Halevy as to his sources and what they said." *Id.* Duncan concluded:

In my judgment, the balance of the evidence is that our story is wrong. . . .

I also think that Dean Fischer has reacted well in this situation. He methodically went back to the sources and spotted the problem. In his dealings with [Source C] he overspoke when he suggested we might make an "apology", but I'm afraid that is the kind of communication error which can happen under pressure.

Halevy's case rests on establishing that there is indeed, as he says, a huge "cover up". It is possible, but I'm afraid that he must prove that case, and prove it with much better evidence than he has for the original story.

*Id.* at 3. Early the next year, Duncan sent Halevy a letter "confirming our conversation in Athens" that Halevy would be placed on "probationary status" for one year. Letter from Richard Duncan to David Halevy (Feb. 13, 1980) (Pl.Exh. 5). The conditions of his probation included the following:

1. The fullest possible sourcing on all reports, which includes the name if possible, but if not, then the closest kind of characterization of the nationality and affiliation of the source. . . .

2. Multiple sourcing when at all possible. . . .

4. A more obvious effort on your part to insure that what you report to TIME (and to the Star) [a newspaper owned by Time, Inc., whose news service Halevy contributed to] is printable, reliable information, reflecting not just informed speculation, but the *most likely true situation.* As part of this, I would like to see

on your part more effort to evaluate the reliability of various sources, and the likehood that they in fact *know* what they are saying.

*Id.* at 1–2 (emphasis in original).

This single instance of possible unreliability by Halevy and Time's careful and rigorous handling of the problem might well lead the jury to conclude that Time acted with care and in good faith in reviewing Halevy's Memo item. But the jury might also conclude that the Begin health story reflects a bias on Halevy's part, or a lack of concern with truth, that leads him to publish with actual malice. The jury could also find that, since an allegedly careful check on the Begin story sources failed to keep Halevy from publishing a story Time could not confirm was true, Halevy should have been more closely supervised by Kelly and others at Time. The jury might give additional significance to the fact that Duncan may have failed fully to reveal the extent of Time's disapproval of Halevy's earlier story. Duncan was deposed *before* defendant released Duncan's memorandum concerning the Begin story and his letter placing Halevy on probationary status. At his deposition, Duncan failed to mention in his account of his criticism of Halevy's work that he actually placed Halevy on probation. In addition, he stated that "I felt there was a large possibility that [Halevy] had been set up ...," Duncan Tr. at 78, despite the fact that his memorandum and decision to put Halevy on probation could suggest that he had rejected that explanation. Duncan also claimed that Dr. Fein told him that his telephone connection with Halevy had been "very bad," that he "could barely understand what Halevy was saying to him," and that he "thought he denied the story to Halevy, but he wasn't quite clear what Halevy was saying to him." *Id.* at 81. In his contemporaneous account of the investigation of Halevy's sourcing, however, Duncan does not mention a bad connection or any confusion on Dr. Fein's part. Instead, he pointed to Dr. Fein's statement that Halevy had never actually asked whether Dr. Fein had been present at the meeting.

Duncan made other statements at his deposition which also have a bearing on Time's perceptions of Halevy's performance. He remembered warning Halevy to be particularly careful in his use of sources on politically touchy and emotionally charged stories, since in such cases "there were a lot of scurrilous rumors and a lot of rumors running around Jerusalem." *Id.* at 78. Duncan also mentioned that Halevy had read into Dr. Fein's cautious denial of the Begin story a confirmation of his story. *Id.* at 81. Taken together with Halevy's apparent failure actually to ask Dr. Fein directly whether he had been at the examination, a jury could find that Time was aware that Halevy had a tendency to report to his superiors that he had confirmed a story even though the person giving the "confirmation" had not clearly been questioned about the information for which he was being used as a source.

C. *Confirmation of the World Wide Memo Item.*

Sometime during the week of December 6, Helen Doyle, a researcher in Time's main office in New York, requested clearance of Halevy's item, possibly for inclusion in a story entitled "Trying to Break the Impasse," which was scheduled to appear in the December 20 issue. *See* Doyle Tr. at 67–71. Halevy "rather quickly gave clearance to that memo item" because he "had no problem with using the information ... for publication." Halevy Tr. at 423–24.

Around December 12, Halevy left Israel for assignments in Central America. Halevy Tr. at 484. He did not arrive back in Israel until February 8, 1983, the day after the Kahan Commission Report was released. During that entire period, he did not discuss the contents of his World Wide item with anyone. *Id.* at 487; *see also* Kelly Tr. at 266. While Halevy was away, no one else in the Jerusalem bureau discovered any information that shed light on the December 6 item.

D. *The Kahan Commission Report.*

On February 7, 1983, the Kahan Commission issued its Final Report. Virtually

everyone at Time connected with the February 21 cover story, "The Verdict Is Guilty," read the Report in its entirety. For purposes of this case, the relevant issues are what the Commission said about Appendix B, about the meeting at Bikfaya, and about Minister Sharon.

The Commission published a portion of its Report, pursuant to section 20(A) of the Commissions of Inquiry Law of 1968, but explained that another "portion of this report, to be called Appendix B, will not be published, since, in our opinion, non-publication of this material is essential in the interest of protecting the nation's security or foreign relations." Report at 2. At least ten explicit references to Appendix B occur in the Report. From these references, Appendix B appears to have at least six sections. The first section contains a list of full names of several individuals identified only by letter in the public report, including some Mossad agents. Report at 9, 15, 21. Section 2 discusses in some form meetings between the Mossad and Bashir Gemayel that "left no room for doubt that the intention of this Phalangist leader was to eliminate the Palestinian problem in Lebanon when he came to power—even if that meant resorting to aberrant methods . . . ." *Id.* at 11. Section 3 refers to the testimony of Intelligence Officer B concerning reports of Phalangist massacres in Druze villages. *Id.* at 12. Section 4 contains "a document which mentions the Phalangists' attitude toward terrorists they had taken prisoner . . . ." *Id.* The fifth section cites a "precautionary measure whose purpose was to ascertain the actions of the Phalangist forces during their operation in the camps . . . ." *Id.* at 19. The sixth section describes "clarifications" of cable reports about the massacres. *Id.* at 30.

The Report also contains numerous references to exhibits, minutes of meetings, and transcripts of testimony before the Commission. One example may be particularly instructive. Immediately preceding his trip to Bikfaya, Sharon met with a number of Phalangist commanders at Karentina. The Commission explicitly refers to two documents, Exhibits 79 and 28, as records of the meeting, and identifies one of the persons who took these notes as Intelligence Officer B. Report at 16. In stark contrast, the Commission's reference to the Bikfaya meeting consists of one sentence: "From there [Karentina] the Minister of Defense went to Bikfaya, to the Jemayel family home, to pay a condolence call." *Id.* No mention is made of Appendix B, any note taker, or any Commission exhibit connected with that meeting. In addition, unlike Sharon's meeting at Karentina, or his meeting the next day with Eitan and Saguy at which the plan to have the Phalangists enter West Beirut was discussed, *id.* at 17–18, the Report offers no information of any kind summarizing the details of the Bikfaya condolence call.

In the section of the Report dealing with direct responsibility for the massacre, the Commission stated that, "in having the Phalangists enter the camps, no intention existed on the part of anyone who acted on behalf of Israel to harm the non-combatant population, and that the events that followed did not have the concurrence or assent of anyone from the political or civilian echelon who was active regarding the Phalangists' entry into the camps." *Id.* at 52. It concluded that "absolutely no direct responsibility devolves upon Israel or upon those who acted in its behalf." *Id.* at 60. The Commission did, however, find Sharon "indirectly" responsible for the events at Sabra and Shatilla. Despite Sharon's not having received explicit warnings about a potential bloodbath from either military intelligence or the Mossad, "it is impossible to justify the Minister of Defense's disregard of the danger of a massacre. . . . Besides this general knowledge [about the Phalangists' practices], the Defense Minister also had special reports from his not inconsiderable [number of] meetings with the Phalangist heads *before Bashir's assassination.*" *Id.* at 67–68 (second interpolation in translation; emphasis added). In addition, the Commission did not necessarily accept Minister Sharon's protestation that he could not have known a massacre would occur. Its Report seems to assume

the truth of his denial and to reach the conclusion that in any event he violated his duty by failing to anticipate and prevent the tragedy:

If in fact the Defense Minister, when he decided that the Phalangists would enter the camps without the IDF taking part in the operation, did not think that that decision could bring about the very disaster that in fact occurred, the only possible explanation for this is that he disregarded any apprehensions about what was to be expected because the advantages— which we have already noted—to be gained from the Phalangists' entry into the camps distracted him from the proper consideration in this instance.... [I]t was the duty of the Defense Minister to take into account all the reasonable considerations for and against having the Phalangists enter the camps, and not to disregard entirely the serious consideration mitigating against such an action, namely that the Phalangists were liable to commit atrocities and that it was necessary to forestall this possibility as a humanitarian obligation and also to prevent the political damage it would entail. From the Defense Minister himself we know that this consideration did not concern him in the least, and that this matter, with all its ramifications, was neither discussed nor examined in the meetings and discussions held by the Defense Minister. In our view, the Minister of Defense made a grave mistake when he ignored the danger of acts of revenge and bloodshed by the Phalangists against the population in the refugee camps.

*Id.* at 68–69. The Commission also found that "in his meeting with the Phalangist commanders, the Defense Minister made no attempt to point out to them the gravity of the danger that their men would commit acts of slaughter." *Id.* at 69.

### E. The Writing of "Take 9."

On February 7, 1983, Time learned that the Report's release was imminent, and that day its New York office sent a Scheduling Query to seven foreign bureaus and the Washington bureau informing them it was planning to do a major story on the Report, its findings, and world reaction. Def.Exh. 14. The next morning, at the World Section story conference, the story was assigned to writer William Smith. Smith Tr. at 81–82. Smith sent out an additional editorial query, *see* Def.Exh. 15, and files began to arrive from Jerusalem that day. Smith Tr. at 81. These files were identified numerically. The ninth file (hence "Take 9"), sent two days later, was the source of the final version of the paragraph at issue in this litigation.

The Jerusalem bureau was understaffed, so Halevy was ordered back to Israel from Honduras. He arrived in Jerusalem on Tuesday evening, February 8, 1983, but had no contact with any source for the information in his December 6 World Wide item until Wednesday or Thursday, when he tried to reach Sources A and B. He was unable to reach Source B, but he found Source A, probably on Thursday. Kelly testified that Halevy told him that Source A said he had been called to testify at an *in camera* Commission session. Kelly Tr. at 268–69. Halevy does not remember his conversation with Source A in detail, but he recalls Source A telling him: "It all started in Bikfaya. Go back and check Bikfaya. It is all there." Halevy Tr. at 565. When he spoke to Source A, Halevy had not yet become concerned with the contents of Appendix B. *Id.* at 584.

Later on Thursday, Halevy was sitting in his office while Kelly wrote the ninth "file" to New York about the Report. Kelly said he "reached this point in the story where I wanted to deal with [Appendix] B." Kelly Tr. at 261:

... And as I recall the conversation, I said, "We really have to find out what is in section B, Appendix B."

Mr. Halevy replied, "I know one thing that is in it: My memo item from December." "What was in my memo of December," I suppose. Again, I can't remember the precise words, but I think those are pretty close.

*Id.* at 261–62. Kelly had, of course, already read the Commission's Report. He

knew that Appendix B contained the names of agents and mentioned documents dealing with the Phalangists. *Id.* at 262. Thus, he felt that "Halevy's information seemed likely to be naturally in that Appendix B, in one of the sections." *Id.* at 263. Halevy's recollection of the conversation is similar:

> ... Mr. Kelly asked me to come into his office and he said, "Dudu, what is in Appendix B?"
>
> I said, "I don't know, I would like to check, but to the best of my understanding"—and this is based on whatever I got from Source A and whatever I got from other people talking about the whole Commission report. I said, "I believe the meeting in Bikfaya which was described in my memo item was part of that thing."

Halevy Tr. at 566.

Halevy relied on two sources identified as Source A and Source C. Source A never actually mentioned Appendix B during his conversation with Halevy. Nevertheless "[t]he last nail which hammers [the information in Take 9] down is a conversation with Source A." Halevy Tr. at 588. Halevy elaborated on his interpretation: "Look. The condolence call at Bikfaya somehow does not play a major role in the published Kahan Commission report." *Id.* at 589. Nevertheless, Source A told him that "[i]t all started in Bikfaya. Go back and check Bikfaya. It is all there." *Id.* at 565. So when Kelly asked him what was in Appendix B, Halevy "play[ed] back in [his] mind" the details of his day in Bikfaya. *Id.* at 591. As Halevy noted, the village was soaked in blood rhetoric that afternoon. But much of what played back in Halevy's mind occurred *after* Sharon had left Bikfaya—for example, Amin Gemayel's speech of revenge, and the violence in the streets. Halevy himself admitted there was no clear link between these events and Sharon:

> But you have to—they lack one thing. They lack—they had a significance to the condolence call, to the many meetings of Sharon—Mr. Sharon with the Gemayel clan prior to the assassination and right

after the assassination, with the Gemayels. But they lack one thing, Appendix B. Where do you get Appendix B there?

> As I said before, in the Kahan Commission, you read the report and you have a feeling that a lot is hidden between the lines, and they make reference and they tell you where it is hidden, and they say it is in Appendix B, in Appendix B.
>
> Here I am talking with source A that says: "It all started at Bikfaya. Watch Bikfaya. Learn the story of Bikfaya."

*Id.* at 599–600. Moreover, Halevy knew that the Commission had not rested Sharon's culpability on any failure to heed whatever dangers he should have seen at Bikfaya, but rather on Sharon's meetings with Phalangists before the assassination as well as the warnings of revenge he received from Israeli analysts.

On the basis solely of this equivocal evidence, given by a source who never mentioned Appendix B, and whom Halevy did not question about Appendix B, Halevy told Kelly that the appendix contained the World Wide item. Before Kelly sent Take 9, however, Halevy made one additional call, to "confirm" his hypothesis. He telephoned Source C:

> ... I put the blunt question and I said, "What the hell is in Appendix B?"
>
> The response I got and the kind of response you kind of expect from that level, "Hey, hey, this is a secret appendix and I am not going to make any reference to that."
>
> I said, "Okay. Tell me at least the nature of Appendix B."
>
> He said, "It's an index. It's a reference book. The names of the officials appearing there and officers appearing there is a direct reference to their testimony, their minutes, or documents that they provided to the Commission."
>
> I said, "Okay, is the notetaker of Karentina mentioned? Is the notetaker of the Karentina meeting mentioned there?"
>
> "Yes."
>
> "Is the notetaker of Bikfava?" [*sic*]

"Yes."

\* \* \* \* \* \*

This is as far as I can go. Don't ask me more and by the way, they are all mentioned in—there is a reference to them also in the public report.

I went back to the public report. I mean, the report I had in my hands. And correctly so, if you read it very carefully.

Intelligence Officer A. Intelligence Officer that. Intelligence Officer this. You get a very clear feeling that we are talking about the same people.

I went into Mr. Kelly's office and raised my thumb to the kind of "Okay, all cleared."

*Id.* at 568–69. This "confirmation" seems clearly to have indicated that Source C was unwilling to provide him with information from the secret portion of the Report. Source C's explanation of the nature of Appendix B would have permitted Halevy to deduce that the *name* of his Source A, who allegedly was a Mossad agent in Lebanon who was present at any of a number of meetings, *see, e.g.*, Halevy Tr. at 136, was listed in section 1 of Appendix B. Source C's information provided absolutely no basis for Halevy's conclusion, however, that Source A's notes of the meeting—if indeed he presented such a report to the Commission—also appear in any part of the appendix. Source C did provide Halevy with "a very clear response," *id.* at 590, but that response in no way confirmed an allegation that the Commission had included in the secret portion of its report evidence that Sharon and the Gemayels discussed the subject of vengeance for Bashir Gemayel's assassination.

Halevy's decision to treat Source C as a total confirmation of his hypothesis is particularly questionable in view of his decision not to tell Source C the information that his response would be viewed as supporting. Halevy never asked Source C if Appendix B contained the Bikfaya notes— much less what those notes said— "[b]ecause it was very clear that Source C is not ready to discuss Appendix B and is not ready to tell me what it contains or what it does not contain." *Id.* at 617. Thus, Halevy never gave Source C the opportunity definitively to deny Halevy's information. A jury could find that Halevy chose not to ask Source C the ultimate question because he knew or suspected that Source C's answer would undermine his hypothesis. Furthermore, Halevy's behavior with Source C echoes his use of Dr. Fein as a source for his earlier story about Begin's health. There, too, Duncan found that Halevy had claimed that a source corroborated information that the source later claimed never to have been questioned about. Halevy's actions could be read to convey his "subjective awareness of probable falsity." *Yiamouyiannis v. Consumers Union,* 619 F.2d at 940.

On receiving Halevy's "thumbs up" signal, Kelly did not question Halevy about his sources further. Neither Kelly nor Halevy had seen Appendix B, but Kelly did know that, while the public report referred to many other items as being contained in Appendix B, it at no point referred to Appendix B in connection with the Bikfaya meeting. Kelly did not question Halevy about this incongruity. He merely proceeded to write in his file, Take 9, the following findings on the subject of Appendix B:

Part of the Report, which is called Appendix B, was not published, "since in our opinion," the Commission said ["] nonpublication of this material is essential in the interest of protecting the nation's security or foreign relations."

Some of that [un]published report simply gives the names of agents identified only by single letters in the published report and secret testimony. And some of it, we understand, was published in Time's World Wide Memo, an item by Halevy, Dec. 6, for which we gave clearance, dealing with Sharon's visit to the Gemayel family to pay condolences. Certainly in reading the Report, there is a feeling that at least part of the Commission's case against Sharon is between

the lines, presumably in the secret portion.

It is clear that the Commission members believed that there were so many red flags flying that practically anyone should have known what would happen if the Phalangists were allowed in the refugee camps. The Report mentions that hidden in Appendix B is testimony by an intelligence officer on "the liquidation of Palestinians carried out by the intelligence unit of Elie Hobeïka," which it turns out was tahe [*sic*] same unit of the Phalangists turned loose in Shatilla and Sabra camps. Hobeïka was the person who was responsible for the assassinated Gemayel's security. So why should anyone be surprised at what happened?

Telex from Harry Kelly to Time World Section at 1–2 (Feb. 10, 1983) (Def.Exh. 16).

At his deposition, Kelly testified that his basis for believing that the World Wide item was in Appendix B was that Halevy told him that Source A, one of Halevy's prime sources for the memo item, had been called to testify by the Kahan Commission, "[t]hat and the material on the record in the Kahan Commission report itself." Kelly Tr. at 269. Kelly elaborated upon his reasoning processes: the fact that Source A was called to testify in closed session indicated that he "had provided information of a sort that was, according to the evidence and record of the Kahan Commission report, contained in Appendix B, or one of the sections of Appendix B." *Id.* The Report referred to Sharon's meetings with Phalangist leaders and to prior massacres carried out by Phalangist troops, and therefore "[t]here were several mentions in the report indicating that Mr. Halevy's memo item was not out of character with material that had been placed in Appendix B and perhaps elsewhere." *Id.* at 347.

Kelly himself implicitly conceded the weakness of his reasoning. He stated that it "is not [his] understanding" that all of the testimony given in closed session was put in Appendix B and that he does not know whether the "documents collected by the Kahan Commission that are not public

.... are in Appendix B." *Id.* at 353–54; *cf.* Halevy Tr. at 602 (Halevy thought all exhibits were contained in Appendix B). Thus, Kelly knew that the mere fact that Source A testified in closed session, and that the Commission had been given the Mossad's notes of the Bikfaya meeting, did not indicate that Appendix B made any substantive mention of either. Kelly summarized his belief that Appendix B contained the information given in Halevy's World Wide item in the following way: "I have to believe it. I have not seen Appendix B. And I am totally unconvinced it is not in Appendix B. So I believe it is in Appendix B." Kelly Tr. at 351. A jury could find that, in the face of absolutely no connection in the Report of the Bikfaya meeting with either Appendix B or with an exhibit number representing a set of minutes, and of the total absence of any source or other supporting evidence for his hypothesis, Kelly's reasoning manifested recklessness as to whether the World Wide item was actually in the appendix.

Kelly's other purported basis for believing that Halevy's item was in the secret portion of the Report is equally questionable. In reading the Report, both Kelly and Halevy found an incongruity between the evidence against Sharon and the harshness of the Commission's recommendation that he leave office. "And we both reached the conclusion that presumably that peg or nail is hidden somewhere in Appendix B." Halevy Tr. at 567. Such reasoning is based on an unspoken assumption that a jury could find may have affected Halevy and Kelly in all their actions: that Sharon deserved the harsh treatment he received, even though in their view the public Report failed to reflect an adequate case for it. They chose to assume—apparently without even a first thought—not that Sharon had been too severely treated relative to others, but that he had been treated appropriately and that somewhere in the secret evidence were minutes of a conversation at Bikfaya that would justify the Commission's recommendation.

Another problem exists with respect to this suggestion about a "hidden" nail or peg that could explain the Commission's condemnation. Kelly testified, presumably in trying to show that the published story was incapable of a defamatory meaning, that the sentence in the article could be read to suggest that Sharon tried in his conversation to *dissuade* the Gemayels from taking revenge. Kelly Tr. at 400. Clearly, if the discussion was exculpatory, it could not have been "part of the Commission's case against Sharon"; moreover, the Commission explicitly found that Sharon did not attempt to prevent the slaughter in his talks with Phalangist leaders. Report at 69. If Kelly believed that the meeting at Bikfaya implicated Sharon in the massacre, then his later testimony that Time's passage should not be read to accuse Sharon of involvement may be found unworthy of belief.

Kelly pointed to a number of passages in the Kahan Commission Report that he claimed were consistent with Halevy's information. *See* Kelly Tr. at 346–37, 513–15. The thrust of the passages Kelly cited is that Sharon had information that *should* have made him sensitive to the dangers involved in letting the Phalangists enter the camps. That is precisely what the Kahan Commission found. None of these passages suggests that Sharon in fact knew the massacres would happen. If the Bikfaya minutes were simply cumulative evidence of Sharon's culpable insensitivity, the minutes could not explain the incongruity Kelly and Halevy found between the public evidence and the Commission's recommendation. In addition, Kelly has said several times that Time had no information to suggest that Sharon encouraged, instigated, or condoned the massacres. *See, e.g., id.* at 217, 226, 228. In either case, the Report does not support the suggestion that details about Bikfaya are contained in the secret appendix. Put baldly, Kelly's logic suggests that the details of the Bikfaya meeting must be in Appendix B precisely because the Commission never mentions them. This *non sequitur* could be regarded by the jury as mere innocent speculation, but the complete lack of other support for connecting the Bikfaya minutes to Appendix B could lead a jury to find that Kelly's desire to provide Time with a scoop about the contents of Appendix B, rather than mere faulty logic, led him to accept Halevy's version.

The best thing that can be said about Take 9 is that no information in Kelly and Halevy's possession at the time they wrote it conclusively proved the falsity of their assertions. Equally true, however, is the proposition that no information in their possession shed any probative light on their statement's truth. As Richard Duncan, whose job it was to supervise Kelly and Halevy, said: when "the publication or the writer of the story has sat there and deduced this fact and has no evidence or has not been told about the truth or probable truth by anyone else .... [it] is what is known in our trade as sheer thumbsucking." Duncan Tr. at 271. In this case, given the other evidence, a jury could reasonably attribute this degree of speculation to a lack of concern for, or a desire to avoid finding out, the truth.

## F. The Writing of "The Verdict Is Guilty".

William Smith, author of "The Verdict Is Guilty," "ha[d] only the information contained within the two pieces of reporting [the World Wide item and Take 9]" and the Commission Report before him when he wrote the paragraph that forms the basis of this lawsuit. Smith Tr. at 415. Smith's initial version of the paragraph stated:

> One section of the report, known as Appendix B, was not published at all, mainly for security reasons. That section contains the names of several intelligence agents referred to elsewhere in the report. TIME has learned that it also contains further details about Sharon's visit to the Gemayel family on the day after Bashir Gemayel's assassination. Sharon reportedly told the Gemayels that the Israeli army would be moving into West Beirut and that he expected the Christian forces to go into the

Palestinian refugee camps. He also reportedly discussed with the Gemayels the need for the Christians to take revenge for the assassination, but the details of the conversation are not known.

Def.Exh. 20; *see* PL Exh. 12 (reproducing entire draft). The only changes made between this initial draft and the published story were the substitution of "Phalangists" for "Christians" in the final sentence and the addition of "of Bashir" after "to take revenge for the assassination."

Smith testified that the basis for the first two sentences was both Take 9 and the Report itself. Smith viewed the second two sentences as resting solely on Kelly and Halevy's material; that is why he inserted the phrase "TIME has learned." That phrase conveys that the information being presented is a Time "exclusive." *See* Smith Tr. at 316; Gonzalez-Alfonso Tr. at 165; Duncan Tr. at 338; Halevy Tr. at 645. In order to "condense" and "summarize" the World Wide item, Smith wrote that Sharon "discussed the need for revenge," rather than that, after the Gemayels' questioning Sharon "gave the Gemayels the feeling" that they would be allowed to indulge their desire for vengeance. Smith Tr. at 402. He claims that he did not interpret either version of this phrase as suggesting that Sharon in any way encouraged the massacre. *Id.* at 441. Smith also described the fact-checking process at Time, which is primarily the responsibility of reporter-researchers. *Id.* at 228. In cases where no easily available source is available with which to check the accuracy of a correspondent's files, he said, the checker must rely on the correspondent's representations. *Id.* at 242. A correspondent's reliability and the consistency of his information with information obtained from other sources are also relevant to the verification process. *Id.* at 255. Smith testified that he had never heard Duncan or anyone else at Time criticize Halevy's work or his support for his stories. *Id.* at 329. He apparently had never been told that Halevy had once been placed on probation.

Nelida Gonzalez-Alfonso was one of the two reporter-researchers assigned to "The Verdict Is Guilty." In general, Time's researcher's guide suggests it is best to have at least one additional source besides a correspondent's file to consider a fact fully verified. Gonzalez-Alfonso Tr. at 135. She testified, however, that "if the reporter files information to which the researcher has no access, he or she must trust what the reporter said and the researcher's responsibility is then to make sure that the writer has portrayed what the report filed accurately." *Id.* at 33. Helen Doyle, the researcher who actually checked the allegedly libelous paragraph stated that she did not send any queries about the material to the Jerusalem bureau because she had no reason to question the file. "[I]n all my research in the story, I did not see anything that contradicted the information in the story that would have prompted me to send additional questions." Doyle Tr. at 176; *see id.* at 138.

The entire fact checking process at Time seems in this instance to have consisted of looking at the World Wide item and Take 9 to see whether Smith accurately summarized them. No one at Time, despite the claim that everyone had read the Commission Report, ever questioned the fact that, in contrast to the Report's discussion of myriad other events, the Report never mentions either Appendix B or any Commission exhibit numbers in connection with the meeting at Bikfaya. That seems to be precisely the kind of incongruity which the researcher's guide refers to as cause for checking a story more closely. *See* Gonzalez-Alfonso Tr. at 137. Furthermore, a reader coming across Time's sentence about Appendix B could readily conclude that Sharon's meeting at Bikfaya was especially crucial to the Commission's "stinging indictment," since it was treated the same way as information about Israel's secret agents. Time's researcher's handbook warns fact checkers to beware of stories that are "factually correct sentence by sentence, yet dead wrong in overall impact." *Id.* at 134.

After Smith had finished writing the article, it was sent to Henry Muller, a Senior Editor in the World Section, to perform a "senior edit," and then to Ray Cave, Time's Managing Editor, to perform the "top edit." Neither Muller nor Cave made any alterations in the paragraph with which this lawsuit is concerned. At some point during this editorial process the title of the story was changed from "Israel's Political Earthquake" to "The Verdict Is Guilty," but it is unclear exactly who suggested this change or when it occurred. *See* Cave Tr. at 124. Neither Muller nor Cave was responsible in any way for assuring the factual accuracy of the article. *Id.* at 140.

As part of Time's normal editorial process, a draft of the article, the "playback," was telexed to all the bureaus which had contributed files to the story. The purpose of the playback is to allow correspondents to make comments about the story and to suggest corrections. *See* Smith Tr. at 219, 234–35; Kelly Tr. 376–83. Both Halevy and Kelly read the playback, and neither suggested any change. Kelly Tr. at 384–85; Halevy Tr. at 642.

Halevy testified that he thought "this paragraph is echoing exactly the Kahan [Commission's] publicized and nonpublicized verdict and is only adding a few spicy details where the Commission might have or could have found that verdict or based its verdict on." Halevy Tr. at 669–70. He believes that no inconsistency exists between the Commission's "publicized" and "nonpublicized" verdicts. *Id.* at 669. The public Report, however, does not ascribe any particular significance to the condolence call, unlike the Time paragraph which implicitly states that the details of that meeting were withheld for reasons of national security. Moreover, in his World Wide item of December 1982 Halevy had described the "spicy details" provided in the paragraph in different terms: "the most crucial findings of the State Inquiry Commission investigating the Sabra and Shatila massacres might turn out to be the newly discovered notes which were taken during [Sharon's condolence call]." The public report indicated that the meeting at Bikfaya did not prove as crucial as Halevy had expected it might be; nonetheless, Halevy and Kelly still relied upon, and advised the writers in New York to rely upon, Halevy's original assessment. Instead of being led to question the significance of the Bikfaya meeting and notes, the jury could conclude that Halevy and Kelly recklessly resolved to give the meeting even greater potential significance in the eyes of readers through their unsupported hypothesis concerning Appendix B.

### G. Post-Publication Evidence.

Robert Parker, a retired Time news editor and deputy bureau chief, wrote press releases for Time. Parker Tr. at 4–6. Over the weekend before an issue reached the newsstands, he would be supplied with page proofs of the cover story to prepare a summary that would "focus on the matter of what we feel will be the greatest interest to the people we are writing it for, the news editors, the newspapers, wire services, radio, TV stations .... to attract the attention and persuade somebody glancing at it casually to read it to the end and hopefully to act on it as we hope they will act on it." *Id.* at 14.

On Sunday, February 13, 1983, Parker prepared a press release concerning "The Verdict Is Guilty." *See id.* at 9–10, 14 (release was exclusively Parker's work). The headline of that document states: "SHARON SAID TO HAVE URGED LEBANESE TO SEND PHALANGISTS INTO CAMPS." Pl.Exh. 15. The release relates that "[a]n unpublished passage in the report of the Israeli commission on the Beirut Massacre discloses that Israeli Defense Minister Sharon met with the Gemayel family on the day after Lebanon's President-elect Bashir Gemayel was assassinated, Time magazine reports this week." *Id.* It then quotes the last two sentences of the paragraph with which this lawsuit is concerned, before quoting other portions of Time's article. Parker testified that neither before nor after preparing and distributing this release, did he discuss its contents with anyone at Time. Parker Tr. at

12, 16–17. On February 15, Kelly telexed Duncan that "that must have been one heck of a news release on the inquiry cover, specifically on the fairly innocuously worded 'Time has learned' [para]graph about Sharon's meeting with the Gemayel family." Pl.Exh. 16. The New York Times reported, apparently on the basis of the release, that Time alleged that Sharon had told the Gemayels that Phalangist militia would be entering camps "and urged them to take revenge." N.Y. Times, Mar. 1, 1983, at A 8 col. 1; Pl.Exh. 7.

This press release is arguably significant. It shows how the Time employee designated to report to the world press on what Time publishes had interpreted the paragraph at issue, and what significance he gave it relative to the rest of the cover story. The jury will have to decide, moreover, whether to believe the proposition that the release was not reviewed by anyone, even after it was issued, and what significance, if any, to give to the fact that Time took no action to correct the effects the release appeared to have caused.

Time also disregarded a pointed indication that its story was false. Immediately before Sharon's lawsuit was filed, Kelly Tr. at 316, Kelly attended a dinner party in Tel Aviv where he had a conversation with Ehud Olmert, a member of the Israeli Knesset who sat on the Committee for Defense and Foreign Relations, and who therefore had been given access to Appendix B. Olmert Tr. at 4–5. By this time, Time's allegation about Sharon had become the center of a major controversy in Israel. In the course of their conversation, Olmert told Kelly that nothing in Appendix B supported what Time had said. Id. at 9. Kelly was "quite concerned" and asked Olmert to check Appendix B again and see if there wasn't some mention of the Bikfaya meeting. Id. A few days later, perhaps after the Israeli libel suit had been filed (Feb. 28, 1983), Olmert looked at the appendix to confirm his impression of its contents. He then telephoned Kelly and "said to him, 'Listen, . . . . I just think you have no case. There is nothing in this that resembles your story.'" Id. at 10–11. Olmert testi-

fied that he made clear to Kelly that he had read the whole appendix, id. at 11, consisting of a total of twelve pages, id. at 7, 57.

Kelly testified that he remembered the conversation, but claims that Olmert did not say he had read the entire appendix and that Olmert mentioned a meeting described in the appendix between Sharon and Hobeika, which Olmert denies having discussed. Compare Kelly Tr. at 323 & 313 with Olmert Tr. at 11 & 62. In any event, Kelly apparently did not mention his conversation with Olmert to Halevy, Duncan, or anyone else connected with the editorial process. Kelly Tr. at 316–320. Despite the weight he had given to Halevy's vague report about the contents of Appendix B, based on an undisclosed source, Kelly says he did not "really" consider Olmert's clear representation to be news. Id. at 323. This sequence of events also could be weighed by the jury as part of a possible factual basis for finding that Kelly had recklessly disregarded the truth when he authored Take 9.

### H. Factual Basis for Actual Malice.

Plaintiff's burden on this motion is to establish a basis in the evidence for findings of fact that could support a jury's verdict that Time published its story with actual knowledge of its falsity, or a reckless disregard for its truthfulness. The evidence would have to be sufficient to justify a conclusion that plaintiff proved actual malice clearly and convincingly. The story's falsity and defamatory meaning are conceded on this motion, though they will be contested at trial.

The story assumed for now to be false has two relevant parts. First, it says that Minister Sharon discussed the need to avenge the death of Bashir at a meeting in Bikfaya with the Gemayels. Second, it says that the Commission refers to that discussion in its secret Appendix B. At trial, plaintiff will have to establish the falsity of both these parts of Time's statement; no liability could attach unless he shows both that there was no such discus-

sion at Bikfaya and that the Commission's secret appendix contains no finding or report of such discussion. At this stage, however, plaintiff need not establish a sufficient basis for a jury to find actual malice with respect to both the parts of Time's statement. If he can show sufficient evidence of actual malice with regard to either claim then he is entitled to a trial.

 Time's possible misuse of attribution is more substantial even than the "secondary" form of actual malice pointed to in *Westmoreland v. CBS, Inc.*, 596 F.Supp. 1170 (S.D.N.Y. Sept. 24, 1984). There, Judge Leval wrote that, "[a]lthough a reporter may have sufficient evidence of his charge to foreclose any material issue of constitutional malice for its publication, he may nonetheless make himself liable if he knowingly or recklessly misstates that evidence to make it seem more convincing or condemnatory than it is." At 1174. In this case, the misstatement does not merely make an otherwise protected defamation greater in degree; by attributing its version of the Bikfaya meeting to the Commission's appendix, Time qualitatively transformed it from a news magazine's view of the facts into a finding by a widely respected, quasi-judicial body. The record demonstrates, in any event, that sufficient evidence exists to raise material questions of fact concerning whether both aspects of Time's story were published with actual malice. *Cf. Time, Inc. v. Pape*, 401 U.S. 279, 287, 91 S.Ct. 633, 638, 28 L.Ed.2d 45 (1971) (omission of characterization of evidence in "extravagantly ambiguous" report as simply an allegation is not evidence of actual malice).

To the extent that Time had any knowledge about the Bikfaya meeting when "The Verdict Is Guilty" was composed, that evidence is reflected in Halevy's World Wide item. Halevy has refused to identify his sources for that story, to give any details about what precisely his sources told him concerning the meeting, or to say whether he has seen the Mossad notes himself. He simply claims that his sources were "one

hundred percent" reliable. Halevy's claim therefore rests solely on his credibility.

Time argues that New York's shield law prohibits using Halevy's refusal to reveal his sources to find actual malice. Time also notes Halevy's representations as to the reliability of his sources, and his history of successes as a correspondent, based in part on his excellent contacts with military, intelligence, and political figures in the Israeli establishment. *See, e.g.,* Defendant's Reply Memorandum on Actual Malice at 77–86.

 The New York Shield Law, N.Y.Civ.Rights L. § 79–h (McKinney 1976 & Supp.1983–84), has been given broad scope. *Beach v. Shanley*, 62 N.Y.2d 241, 250–52, 465 N.E.2d 304, 308–10, 476 N.Y. S.2d 765, 769–71 (1984); *Oak Beach Inn Corp. v. Babylon Beacon, Inc.*, 62 N.Y.2d 158, 164–68, 464 N.E.2d 967, 970–72, 476 N.Y.S.2d 269, 272–74 (1984). This privilege defeats even an inquiry into the leaking of grand jury minutes—a criminal offense—*Shanley*, 62 N.Y.2d at 252–53, 465 N.E.2d at 310, 476 N.Y.S.2d at 771–72, and may be asserted by press defendants in libel cases, *Oak Beach Inn*, 62 N.Y.2d at 166–67, 464 N.E.2d at 971, 476 N.Y.S.2d at 273. The shield law creates an absolute bar on holding a journalist in contempt for refusing to disclose sources. *Id.* at 166, 464 N.E.2d at 970, 476 N.Y.S.2d at 272. Although the shield law is broad, however, it does not establish an "absolute right" or grant journalists "complete immunity from all legal consequences." *Id.* at 165, 464 N.E.2d at 272, 476 N.Y.S.2d at 970. Rather, it gives "special force" to the principle that a court should not grant a harsher sanction for nondisclosure than is necessary to protect legitimate interests. *Id.* at 166–67, 464 N.E.2d at 971, 476 N.Y.S.2d at 273. Halevy's refusal to disclose identifying information about his sources cannot, therefore, preclude him altogether from testifying that he obtained information from what he considered to be trustworthy sources. Furthermore, the mere fact of his reliance on the statutory privilege should not be considered as evidence of malice or knowledge

of falsity. The Legislature has recognized the press' need to keep its sources confidential and the expression of that legitimate need should not be penalized. *Cf. Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

But section 79–h is a shield, and no more. *Cf. Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1087 (5th Cir.) (plaintiff in libel suit cannot "use his Fifth Amendment shield as a sword" to withhold information that defendant needs to prepare its truth defense), *rehearing denied*, 611 F.2d 1026 (5th Cir.1979). Time cannot insulate Halevy's state of mind from scrutiny simply by asserting that the information he obtained came from confidential sources. Nor may Halevy insulate his reliance on sources from further inquiry merely by claiming that he has often used a source in the past and that the information he received was always reliable. Minister Sharon must have the right to probe, without infringing on Halevy's right to withhold identifying details, whether Halevy had any source for the statement he made, whether and to what extent any source he had gave him information that supports the statement and whether he had an adequate basis for believing in the reliability of this source or the accuracy of the information. *Cf. Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (similar guidelines for magistrates evaluating sufficiency of anonymous information to justify issuing warrant).

That questions based on these lines of inquiry should be permissible does not mean that a reporter could be required to answer any particular question, or could be punished for refusing to do so. The spirit of New York's shield law, if not the letter, requires courts to cease utilizing public power to force reporters to answer questions about their sources. Furthermore, a reporter's reliance on the shield law should not necessarily prevent a court from granting summary judgment in his—or his magazine's—favor. Even where one or more sources is not revealed, the record may nevertheless establish the absence of an adequate factual basis for a finding of actual malice. Moreover, Time is correct when it argues that potential bias on the part of sources does not necessarily create an issue of actual malice. It is important to note, however, that Time relies on cases where sources were sufficiently identified to permit assessment of the potential effect of their biases. *See Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1027–28 (5th Cir.1975) (reliance on identified sources was justifiable despite sources' involvement in events); *New York Times Co. v. Connor*, 365 F.2d 567, 573–77 (5th Cir. 1966) (same); *Loeb v. New Times Communications Corp.*, 497 F.Supp. 85, 92 n. 12 (S.D.N.Y.1980) (reliance on plaintiff's ex-wife and ex-husband ·of plaintiff's current wife was permissible).

But, in this case, Halevy's reliance on the shield law has left the record in a state that precludes summary judgment in Time's favor. Halevy does seem well connected in Israel and to have access to sensitive data. He has not provided any information that would help the court to decide, however, whether he used those sources or whether the sources he used were reliable. He has not revealed precisely what he asked his sources and what they told him or gave him that established to his satisfaction the "Green Light" item. Thus, for example, he has refused to confirm or deny that he had seen the Bikfaya minutes. The lack of such corroborating detail reduces the evidentiary value of even an apparently reliable source. Moreover, he has given no concrete instances of the prior reliability of these sources that would allow a finder of fact to determine whether his reliance on them here was justified.

These deficiencies in Halevy's description of his sources and their statements have particular significance for several reasons. First, Halevy's reliability in the use of sources has been placed in genuine dispute by his story on Begin's health; in that instance, Time checked on Halevy's sources, found that they denied Halevy's claim, and placed Halevy on probation. Time now suggests that the sources may have lied to Fischer about what they told

Halevy, but that issue cannot be resolved as a matter of law. Furthermore, Halevy's own use of sources in connection with the Take 9 file presents evidence of lack of concern about the truth. From the statement by one source that "It all began in Bikfaya," and the confirmation by another source that Appendix B contains a list of the names of agents who took minutes at the meetings the Commission considered, Halevy felt justified in giving a "thumbs up" sign to Kelly for the statement that the information in his World Wide item was contained in Appendix B. Furthermore, he failed to ask either of his sources straightforwardly whether his hypothesis about Appendix B was true, or to use the occasion to check on the accuracy of his December 6 description of the Bikfaya minutes despite the Commission's apparently having given no weight whatsoever to information he had allegedly been told might be "crucial." Halevy also raises genuine disputes as to his credibility by his claims that he did not mean in the "Green Light for Revenge?" item to suggest anything particularly adverse to Minister Sharon, that he does not remember writing "for Revenge" into the title (arguably a false exculpatory statement), that he relied on Sharon's public testimony in writing the story, and that he still does not understand the allegedly libelous paragraph to accuse Sharon of anything materially different from the Commission's findings about Sharon. Finally, some evidence exists that Halevy possesses deeply ambivalent feelings about Sharon. Evidence of bias cannot establish actual malice. But it may provide a motive for defaming someone or explain apparently illogical leaps to unsupported conclusions. In this case, while Halevy has at times expressed admiration for Minister Sharon, a jury could conclude that he regards Sharon as a symbol of the "mysticism, fascism and radicalism" that he believes is engulfing Israel. Letter from Halevy to Richard Duncan (May 17, 1984) (Pl.Exh. 2). Halevy views the "actual vindication of Arik Sharon" as "very worrying," *id.;* at his deposition, he discussed at length the parallels he draws between cur-

rent Israeli society and pre-Nazi Germany and his intense disillusionment with Sharon, a hero from his youth. Halevy Tr. at 760–67.

The jury will have to decide the tenability of the claim by every one of Time's employees connected with this paragraph that it was not intended to suggest, and does not in their view suggest, that Minister Sharon condoned the Phalangists' plan to avenge Bashir's death. The title given the World Wide item, and the press release issued by Time, could lead a jury to conclude otherwise. The jury could reasonably find that, although Time's correspondents, writers, researchers, and editors concede that they had no support for an allegation that Sharon encouraged or condoned the massacre at Sabra and Shatilla, they nonetheless composed an article which was very likely to convey such an impression to its readers. *Cf. Cianci v. New Time Publishing Co.,* 639 F.2d 54, 69 (2d Cir.1980) (Friendly, J.) ("[I]ndeed, despite the ingenious construction of the article, more naivete than ought to be demanded even of judges is needed to consider the article as doing anything [other than defaming the plaintiff].").

The evidence that Time acted with actual malice in attributing the account of Sharon's condolence call to the Commission is also strong enough to go to the jury. First, the allegation about Appendix B ultimately raises the same credibility questions present with regard to Halevy's World Wide item. Far from assuaging potential concerns about Halevy's good faith, the greater details he provided about his conversation with Sources A and C increases the possibility that a jury could find that he "ha[d] reason to suspect that his publication is false." *Herbert,* 441 U.S. at 160, 99 S.Ct. at 1640. Halevy never discussed Appendix B with Source A and it is unclear whether Source A even had access to Appendix B. Halevy says he believed that Source C "definitely" had access to the appendix. Yet rather than asking Source C questions that would have uncovered definitive information about the unpublished parts of the Report, Halevy asked him gen-

eral questions and then inquired about nothing but the names of agents contained in Section 1 of the appendix. "[He] cannot know whether the answers would have provided information which would have been helpful in determining what really happened." *Pep v. Newsweek, Inc.*, 553 F.Supp. 1000, 1002 n. 2 (S.D.N.Y.1983). A jury could find that Halevy acted as he did to prevent a reliable, informed source from denying his story. *Id.* at 1003.

Halevy's behavior in this respect is materially different from a reporter's decision not to confront the subject of a story, or a decision to discredit the subject's denials. *See Edwards v. National Audubon Society*, 556 F.2d 113, 121 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977); *Davis v. Costa-Gavras*, 595 F.Supp. 982 at 988 (S.D.N.Y.1984). Here, Halevy had already decided that Source C was informed, reliable, and objective. Source C's denial would not have been "so commonplace in the world of polemical charge and countercharge" that it could not put Halevy on notice. *Edwards*, 556 F.2d at 121. That is precisely the reason for Halevy to contact Source C—to confirm *or deny* his initial opinion. Halevy had no duty to check with Source C. But a jury could find significant the fact that, having decided to do so, Halevy failed to ask any questions that would have led his source to deny the hypothesis that he had set out to test.

In addition, a jury might reject Harry Kelly's testimony concerning the composition of Take 9. Kelly claims he believed that secret portions of the Report must contain the Commission's case against Sharon, and that the Bikfaya meeting is discussed in Appendix B. He also claims, however, that Time's story might be read as indicating a red, not a green, light for revenge. The inconsistency among these statements could lead a jury to find that Kelly based his file on nothing more than speculation. If the jury finds that the allegation was "fabricated" or "the product of [Kelly's] imagination," it could permissibly infer actual malice. *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326.

No one at Time has ever seen Appendix B, so its writers could not have *known* that what Time said about the appendix was false. *See St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325. But "a publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements." *Gertz*, 680 F.2d at 538. The record arguably contains such clear indications. Defendant's memoranda are replete with references to how Time's employees "read, reread and relied upon the Kahan Commission Report," Defendant's Reply Memorandum on Actual Malice at 9, and were "specifically aware" of what the Report said about Appendix B, *id.* at 22. The Report mentioned the Bikfaya meeting in only one sentence, however, and provided no further mention of the meeting by way of citation to Appendix B, or to exhibits submitted to the Commission, or to testimony in either public or secret session. This silence about the meeting provided an obvious reason to question, if not in fact to doubt, the accuracy of Halevy's information. *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326. Time's failure to deal with this problem could lead a jury to question, if not in fact to doubt, the good-faith implementation of its verification processes.

In sum, the record contains sufficient admissible evidence of actual malice to preclude summary judgment. While Time may be able to satisfy the jury that it believed what it stated was true, it is the jury to whom Time must make its case.

## V. Compensatory and Punitive Damages

 Time claims that, as a matter of law, Minister Sharon is not entitled to compensatory or punitive damages and that his suit must therefore be dismissed. First, Time argues that Minister Sharon's motives in commencing this litigation render him incapable of proving damages. Defendant's Memorandum at 178–80. Even assuming, as Time contends, that Minister Sharon commenced this suit to vindicate the State of Israel and the Jewish people,

or that he might not have brought this suit had he not had a long-standing feeling that Time Magazine was biased against Israel, his motives are irrelevant to the question whether, having brought the suit, he can establish damages to maintain it. Minister Sharon is not seeking damages for pecuniary losses suffered in his career as a politician or as a farmer, but since Time's statements in the paragraph at issue were libelous *per se, see Sharon I,* 575 F.Supp. at 1172–73, he need not prove special damages in an action based on these statements. *Hinsdale v. Orange County Publications,* 17 N.Y.2d 284, 217 N.E.2d 650, 270 N.Y.S.2d 592 (1966). Prevailing plaintiffs in libel trials are entitled to compensation for "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz v. Robert Welch, Inc.,* 418 U.S. at 350, 94 S.Ct. at 3012. Such injury is every bit as "actual" as the loss of employment opportunities or the costs of trying to mitigate the sting of a defendant's libel. The real difference lies in the difficulty of quantifying such damages, not in deciding whether they exist.

Time also argues that plaintiff has failed to raise genuine questions of material fact on his claim of having suffered damage to his reputation. Time easily demonstrates that Minister Sharon is a controversial figure. *See* Defendant's Memorandum at 174–77. But Sharon is not "libel proof." The critical press reports Time offers have not been subjected to any scrutiny, and present only one side of the Sharon saga. In addition, Time's allegations were potentially more damaging to Sharon's reputation than the Report's findings. Neither his general reputation nor his reputation with respect to the events at Sabra and Shatilla is such that he is precluded from suing Time. *See Sharon I,* 575 F.Supp. at 1168–72. Furthermore, sufficient evidence is in the record from which a jury could infer that Sharon's reputation was actually injured by Time's actions. *See, e.g.,* Sharon Tr. at 181–83; Dan Tr. at 198–99, 224–26; Olmert Tr. at 186–89. Minister Sharon's reputation witnesses, whose depositions are not yet complete, may well offer further evidence that Sharon's reputation was damaged as a result of Time's story.

Moreover, New York law presumes that statements that are libelous *per se* damage the victim's reputation. *See Meehan v. Snow,* 494 F.Supp. 690, 695 (S.D.N.Y.1980); *Buckley v. Littell,* 394 F.Supp. 918, 945 (S.D.N.Y.1975), *aff'd in part, rev'd in part on other grounds,* 539 F.2d 882 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). Time correctly argues that a jury should not be entitled to presume too much, and that a plaintiff, particularly a public figure, should not be entitled to recover a significant amount of compensatory damages for injury to his reputation without showing a significant amount of damage. Defendant's Memorandum at 184–88. *Gertz* requires that juries not be allowed to award compensation that bears no relationship to the loss a defendant's actions have caused: "the States have no substantial interest in securing for plaintiffs ... gratuitous awards of money damages far in excess of any actual injury." 418 U.S. at 349, 94 S.Ct. at 3011. Again, however, the appropriate time to take into account the level of plaintiff's injuries is at the close of trial in the charge to the jury, or at the time a post-verdict motion on this issue is filed. In New York, a plaintiff entitled only to nominal damages of one dollar is entitled to the vindication which a jury verdict can bring. *See Buckley v. Littell,* 539 F.2d at 897; *Goldwater v. Ginzburg,* 414 F.2d 324, 340 (2d Cir.1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970).

Finally, Time argues that plaintiffs who occupy positions such as Sharon's are not entitled to punitive damages. Defendant's Memorandum at 188–91. *Gertz* describes the dangers inherent in awards of punitive damages in libel cases. *See,* 418 U.S. at 350, 94 S.Ct. at 3012 (punitive damages may "bea[r] no necessary relation to the actual harm caused"). Nonetheless, al-

though "[i]t may be that ... [this concern] will ultimately lead the Supreme Court to hold that punitive damages cannot constitutionally be awarded to a public figure ... to date the Court has not so held ...." *Buckley,* 539 F.2d at 897. In *Buckley,* the Second Circuit stated that "absent clear word from the Court to the contrary, or an en banc, we are bound to abide by our own controlling decision in *Goldwater* [*v. Ginzburg,* 414 F.2d 324 (2d Cir.1969) (allowing award of punitive damages to a high public official) ], and therefore must permit such an award in the appropriate case." 539 F.2d at 897.

■ Constitutional and legal restrictions do limit the circumstances under which a jury may award punitive damages, and the amount they are entitled to award. Time argues that one such limit is that no punitive damages may be awarded in a case where only "constitutional" malice, and no common-law malice, has been shown. Time asserts the alleged absence of common-law malice here as a basis for distinguishing *Goldwater* and *Buckley,* which permitted punitive damage awards. This distinction may well lack practical significance, since when a defendant prints something it *knows* to be false, a jury will normally infer a desire to hurt the victim of the story, which constitutes common-law malice in the sense of ill will. Assuming, however, that Time is correct, and that state law requires proof of common law malice before allowing any recovery for punitive damages even when actual malice has been shown, the record contains sufficient evidence of ill will to permit that issue to go to the jury. *See* R. Sack, *Libel, Slander and Related Problems* 353 (1980). The parties should brief whether New York policies governing the award of punitive damages support a rule that turns on proof of a defendant's ill will toward a plaintiff, even where the plaintiff has proved actual malice sufficient to trigger liability. The issue will best be decided on a more complete record, prior to submission of the case to the jury, along with the other issues raised by Time relating to constitu-

tional and legal restrictions on a jury's award of punitive damages.

## VI. Conclusion

Time's arguments fail to justify a decision to dismiss the case, or for judgment in its favor. Taken one by one, no single claim warrants the relief Time seeks. On the other hand, Time's arguments demonstrate the extraordinary nature of this litigation, and the unfairness it has the potential to cause. Taken together, Time's claims may yet eventually earn it the relief it seeks.

In its present state, the record still does not show whether the discussion Time described is in fact in Appendix B, or whether a discussion about revenge is reflected in the Bikfaya minutes. Furthermore, Time has had other, substantial difficulties in obtaining evidence, the full effects of which can only be known after the trial is over. Time may also suffer prejudice at the trial on the actual malice issue, through the use of evidence reflecting an application against Halevy of its own strict standards concerning sources, in a situation in which Halevy may have acted innocently. And plaintiff no doubt will seek to prove Halevy's alleged bias through the use of a letter, probably usable in some manner, but possibly an anguished and hence unbalanced view of Halevy's true feelings about Israel, if not about Sharon. (The claim that Time is biased against Israel or Jews is so unsubstantiated that no evidence on the subject will be allowed.) If the present state of this record does not change materially, a verdict in plaintiff's favor, based on the absence of important evidence as to falsity and on the presence of potentially prejudicial evidence as to actual malice, might not be allowed to stand.

The trial could, however, lead to the development of facts and evidence that establish falsity and actual malice. Time may have been seriously misled or poorly served by some of its personnel. While the Court recognizes its responsibility to put an end to meritless cases, Time also has a responsibility to exercise its own power with larg-

er goals in mind than the end of deterring libel actions, a rationale indistinguishable in principle from the deterrent goals that plaintiff admits he pursues and which Time considers highly improper. The shield laws may serve sound interests in governing the relationship between the courts and the press, but they serve no sound purpose if used as an excuse for the press to fail to keep its own shops in order. Time would do its own proper part in avoiding the risks and costs of this litigation by inquiring thoroughly into the sources behind its story, if it has not already done so, and acting thereafter as simple fairness would indicate is appropriate. As further information becomes available from Israel, moreover, the parties should not permit the trial to distract them from further, good-faith efforts to resolve their differences.

Defendant's motion to dismiss or for summary judgment is denied, but without prejudice to a later consideration of its arguments on a complete record and in the interests of justice.

SO ORDERED.